**Regina M. MURATORE, Plaintiff,**

v.

**M/S SCOTIA PRINCE, her tackle, apparel, etc., in rem; Prince of Fundy Cruises Ltd., and Transworld Steamship Co., Inc., in personam, Defendants.**

**Civ. No. 86–0141–P.**

United States District Court,
D. Maine.

March 20, 1987.

---

Michael X. Savasuk, Portland, Me., for plaintiff.

Leonard Langer, Paul G. Vielmetti, Portland, Me., for defendants.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Plaintiff filed this suit seeking to recover damages for physical injuries and mental pain and suffering allegedly suffered while on board the M/S SCOTIA PRINCE. Jurisdiction is based on this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 (1982), diversity of citizenship with a proper amount in controversy pursuant to 28 U.S.C. § 1332(a) (1982), and the Court's powers of pendent and ancillary jurisdiction.

## I. FINDINGS OF FACT

1. The following parties are involved in this action: Plaintiff, Regina Muratore, is a resident of Chicopee, Massachusetts. Defendant Prince of Fundy Cruises, Ltd. (Prince of Fundy) is the bareboat charterer of the M/S SCOTIA PRINCE (SCOTIA PRINCE), a cruise ship owned by Transworld Steamship Company, Inc. (Transworld). In September of 1984, Prince of Fundy was party to a contract with a company called Floating Fleet, Ltd. (Floating

Fleet). Under that contract, Floating Fleet operated all the hotel services on board the SCOTIA PRINCE, *i.e.*, the cabin operations, restaurants, bars, casino, and gift shop. Floating Fleet, in turn, had contracted with a company called Intermed Photos, Ltd. (Intermed) to provide the photographic concession on board the SCOTIA PRINCE. Under the Intermed-Floating Fleet agreement, Floating Fleet provided complimentary berths, together with darkroom and other space, in exchange for a share of the profits from the photographic concession.[1] In September of 1984, Mark Ayling and Martyn Moore were the Intermed photographers on board the SCOTIA PRINCE. Prince of Fundy and Floating Fleet are both subsidiaries of Transworld.

2. On Labor Day weekend, September 2–3, 1984, Plaintiff and her traveling companion, Marlene Lemoine, were passengers on board the SCOTIA PRINCE for a round trip between Portland, Maine, and Yarmouth, Nova Scotia. Plaintiff had arranged the trip through Peter Pan Tours, who provided bus transportation between Springfield, Massachusetts, and Portland, Maine.

3. Peter Pan tour guide William F. Donovan (Donovan) also rode from Springfield to Portland on Plaintiff's bus. Upon arrival in Portland, Donovan left the bus and returned with boarding passes, meal vouchers, and gambling chits issued by Prince of Fundy. He then distributed these materials to the people in his group, including Plaintiff and her friend.

4. Prince of Fundy had an established ticketing procedure that it followed in issuing group tickets. That procedure regularly produced three documents: a work sheet used by the accounting office, a copy of the tour confirmation, and a rooming list with cabin assignments. The work sheet provided spaces for the signatures of the tour escort and the ticket seller. When a tour group arrived, the escort signed the work sheet as confirmation of the number of passengers. Prince of Fundy then issued

---

**1.** The evidence suggests that Floating Fleet received a flat per-passenger fee or a percentage of the gross revenues from the photo concession. The details of the concession agreement are not important to the outcome of this case.

the group ticket and accompanying ticket jacket, together with boarding passes, meal vouchers, and gambling chits.

5. The ticket issued for Plaintiff's group was numbered "T73643." "T" designated a tour group ticket, as opposed to a ticket issued to an individual passenger. Donovan signed the work sheet for ticket T73643 on the line marked "tour escort signature" and, as a result, received the master ticket and ticket jacket, together with boarding passes, meal vouchers, and gambling chits for each passenger.[2]

6. Ticket T73643 contained certain terms and conditions of passage, as well as clearly marked language warning each passenger that such terms and conditions existed.[3] That warning was prefaced by the word "IMPORTANT" printed in bold type. The terms and conditions were set out in twelve paragraphs on the inside of the front and back covers, with clear language indicating that the conditions were "continued inside of back cover." All paragraphs establishing any type of liability or time limitation, including paragraph nine establishing a time limitation for bringing law-

suits, were labeled with an appropriate heading all in upper-case lettering.

7. Plaintiff never possessed ticket T73643,[4] nor did any of the documents Plaintiff did receive (boarding passes, meal vouchers, and gambling chits) alert her to the existence of conditions of passage limiting her legal rights.[5]

8. On the evening of September 2, 1984, as passengers boarded the SCOTIA PRINCE, two photographers were taking the passengers' pictures. Plaintiff told the photographers that she did not wish to have her picture taken. When the photographers ignored Plaintiff's request, Plaintiff walked backward onto the ship. One photographer took her picture from the back. The next day, Plaintiff's picture was displayed with pictures of other passengers and offered for sale. Plaintiff's picture, however, had been "doctored": a picture of a gorilla face had been attached to cover the back of Plaintiff's head.

9. At approximately 7:30 the next morning, Plaintiff and her traveling companion made their way to the cafeteria for breakfast. Plaintiff slipped and fell down a

2. Plaintiff contested all testimony identifying the signature of Donovan, the tour escort, and of Marie Youngs, the ticket seller. The Court is satisfied, however, that Donovan indeed signed the work sheets and received the group ticket. First, the work sheet and the accounting copy for ticket T73643 both show a signature that appears to be "W.F. Donovan." Defendant's exhibits 13, 14. See also Defendant's exhibits 11, 12. Second, Plaintiff's testimony that Donovan left the bus and returned with boarding tickets, meal vouchers, and gambling chits suggests that Donovan, as tour guide, received those documents from Prince of Fundy. Finally, Baird's deposition testimony was that, pursuant to Prince of Fundy's regular ticketing procedure, a tour guide could not possibly receive the boarding pass, meal vouchers, and gambling chits without also receiving a master ticket and ticket jacket. Baird Dep. at 8–9, 14–15. The testimony as to Prince of Fundy's ticketing procedure was fully corroborated by the deposition testimony of Henk Pols, President of Prince of Fundy. Pols Dep. at 18–28. The Court finds, therefore, that Donovan signed the documents and received a master ticket and ticket jacket.

3. The Court finds that the group tickets issued by Prince of Fundy in September 1984 were identical in form to the sample ticket marked as Defendant's exhibit 7. The Court makes the

finding on three bases. First, Baird and Pols both testified that the sample ticket was identical to the one that would have been issued for Plaintiff's tour group. Baird Dep. at 18–20; Pols Dep. at 27. Second, the "accounting copy" of the sample ticket is identical in form to Defendants' Exhibit 14. Finally, the Court notes that an established business such as Prince of Fundy is not likely to change something as standard as a ticket form, absent some change in the law governing such tickets. The Court is aware of no such change.

4. This finding is based on Plaintiff's testimony at trial, and on the deposition testimony of Baird and Pols suggesting that the *tour guide*, rather than individual passengers, received a master ticket. Baird Dep. at 14, 19–20; Pols Dep. at 19, 27–28. See also Muratore Dep. at 21. This finding is also supported by Pols' testimony that the "T" preceding a ticket number designates a tour ticket, as distinguished from individual passenger tickets. Pols Dept. at 22.

5. Defendants do not contend that any of these documents provided Plaintiff with notice of the limitations. See also Plaintiff's exhibit 1 (bus boarding pass); Baird Dep. at 39–41 (boarding passes are collected by Prince of Fundy as passengers board, then returned to Prince of Fundy's ticket office and destroyed).

flight of stairs. At the time of the fall, the stairs were carpeted.[6]

10. Shaken up from the fall, Plaintiff proceeded to the cafeteria for a cup of coffee and a cigarette. She then filled out an accident report and returned it to Guiseppe Ravenna, manager of the SCOTIA PRINCE. At that time, Plaintiff declined medical assistance from the ship's physician.

11. During the course of the trip, Plaintiff had several confrontations with the photographers. On one occasion, one of the photographers, dressed in a gorilla costume, approached Plaintiff. When Plaintiff turned her back, one photographer told the other, within the hearing of Plaintiff and others, "Take the back of her—she likes things from the back." The tone of the comment suggested lewd implications, and Plaintiff understood the comment to be a lewd remark. On another occasion, the photographers approached Plaintiff and Ms. Lemoine as they sat in the coffee shop. Plaintiff covered her face with her hands to avoid having her picture taken, but the picture was taken regardless. Plaintiff was embarrassed at the pictures, felt harassed throughout the trip, and spent several hours of the trip in her cabin to avoid the photographers.

12. After departing from the SCOTIA PRINCE at about 8:00 p.m. on September 3, 1984, Plaintiff and her traveling companion rode the Peter Pan Tours bus back to Springfield. Plaintiff later experienced severe bruising and physical discomfort, especially pain in her lower back. Plaintiff has continued to experience pain in varying degrees until the present time. Her injury has interfered with activities such as lifting, gardening, or walking for extended periods of time. She is able to work and participate in normal social activity, however, and was able to take a cruise in February of 1985.

## II. PROCEDURAL BACKGROUND

This Court previously denied Defendant's motions to dismiss and for summary judgment. At bench trial, counsel for both sides presented live witness testimony and testimony by deposition.[7]

Prior to trial, Defendant M/S SCOTIA PRINCE raised the issue of *in rem* jurisdiction over the vessel. Specifically, the SCOTIA PRINCE argued that *in rem* jurisdiction did not exist because Plaintiff had never arrested the vessel, never sought a letter of undertaking or comparable security to stand in the vessel's place, and because the vessel was outside of the Court's territorial jurisdiction at the time of trial. In her post-trial brief to the Court, Plaintiff conceded that she had not secured *in rem* jurisdiction. The Court, therefore, dismisses all *in rem* claims against the vessel, M/S SCOTIA PRINCE, and will proceed to consider the *in personam* claims against

**6.** The condition of the stairs at the time of Plaintiff's fall was disputed at trial. Plaintiff testified at trial and throughout her deposition that the stairs were made of metal and were not carpeted. Plaintiff also produced depositions of two other passengers on the same cruise who also testified that the stairs were metal and uncarpeted. Although each of the three people could remember those two distinct facts, each had difficulty making any further recollection. None of the three, for example, could remember the color of the stairs or whether a middle handrailing was in place, and the two other passengers had difficulty placing the location of the stairway. Defendant's evidence was based on the deposition testimony of three persons responsible for the SCOTIA PRINCE's maintenance and daily operation. Henk Pols, Prince of Fundy's President and General Manager; Guiseppe Ravenna, hotel manager for Floating Fleet aboard the SCOTIA PRINCE; and Klaus

Poneleit, boatswain of the SCOTIA PRINCE, all testified that the stairs were carpeted during September of 1984. Pols Dep. at 3–10; Ravenna Dep. at 24–25, 43–44; Poneleit Dep. at 6–13. Although none of these three actually saw the stairway at the time of Plaintiff's fall, the Court finds persuasive their testimony as to the ship's condition in September of 1984. In particular, the Court is persuaded by the testimony of boatswain Poneleit that he *replaced* the carpet on the stairway in question in November, 1984, and that he has never changed the carpet during the cruise season. After weighing all the evidence, the Court finds it more probable than not that the stairs were carpeted when Plaintiff fell.

**7.** As the Court indicated at trial, it has noted objections raised at the time the depositions were taken. The Court has considered only that evidence which it has determined to be properly admissible.

Defendants Prince of Fundy and Transworld.

## III. CONCLUSIONS OF LAW

### A. *Statute of Limitations*

Defendants argue that Plaintiff's action is time-barred under the terms of a Contract of Passage issued in Plaintiff's name. The Contract of Passage allegedly establishes a one-year statute of limitations for the filing of personal injury or loss of life suits. Defendants assert that the Contract of Passage was set forth in a master ticket picked up by William Donovan, a tour guide for Peter Pan; that Donovan was acting as Plaintiff's agent; and that Plaintiff is charged with the knowledge of her agent. Plaintiff argues that her action is not time-barred because Prince of Fundy did not do all it reasonably could do to communicate the existence of a limitations period to her, and because she never possessed the ticket containing the terms of passage.

As set forth above, the Court finds as fact that Donovan signed for and received a group ticket, and that the ticket contained clearly marked language warning each passenger to examine the terms and conditions of passage set forth on the ticket jacket. Those limitations were not communicated to Plaintiff. The Court turns now to consider the legal effect of those findings.

### 1. *Validity of the Limitation on Liability—Physical Characteristics of the Ticket* [8]

Section 183b of title 46, United States Code expressly provides that maritime contracts may contain valid time limitation periods. That section states:

> It shall be unlawful for the manager, agent, master, or owner of any sea-going vessel ... transporting passengers ... from or between ports of the United States and foreign ports to provide by rule, contract, regulation, or otherwise a shorter period for giving notice of, or filing claims for loss of life or bodily injury, than six months, and for the institution of suits on such claims, than one year, such period for institution of suits to be computed from the day when the death or injury occurred.

46 U.S.C. § 183b(a) (1982 & Supp. III 1985).

The statute clearly authorizes vessel owners to impose a one-year limitations period on actions for death or personal injury. *Barbachym v. Costa Line, Inc.*, 713 F.2d 216 (6th Cir.1983); *DeNicola v. Cunard Line, Ltd.*, 642 F.2d 5 (1st Cir. 1981). Such limitations, however, are valid only if the passenger has notice. The First Circuit has adopted the test of "reasonable communicativeness," first set out in *Lipton v. National Hellenic American Lines*, 294 F.Supp. 308 (E.D.N.Y.1968), to determine the effect of terms and conditions in contracts for passage at sea. *Shankles v. Costa Armatori, S.P.A.*, 722 F.2d 861 (1st Cir.1983). Courts applying the reasonable communicativeness test "have deemphasized such traditionally significant factors as the placement of the carrier's signature and the contents of the contract proper and focused instead on the adequacy of notice appearing anywhere in the ticket documents." *DeNicola v. Cunard Line, Ltd.*, supra, 642 F.2d at 9. *See also Silvestri v. Italia Societa per Azioni di Navigazione*, 388 F.2d 11 (2d Cir.1968).

Applying the reasonable communicativeness test to the master ticket in this case, the Court concludes that the ticket validly imposed a one-year limitations period on the bringing of death or personal injury suits. The ticket cover, as found above, clearly directed the ticket holder to examine the terms and conditions of the contract of passage. Various print types called special attention to those terms, and the terms were set out in a straightforward manner. The terms were not so numerous, nor the location of the paragraph setting forth the limitations period "buried" in such a way that the ticket could be considered confusing or deceptive to the ordinary person. The Court thus concludes as a matter of law that Prince of Fundy did all

---

**8.** Federal maritime law determines the validity and effect of the limitation on liability set out in paragraph 9 of ticket. *See DeNicola v. Cunard Line, Ltd.*, 642 F.2d 5, 7 n. 2 (1st Cir.1981).

it could reasonably do through the physical characteristics of its tickets to communicate the contractual limitations to a passenger actually in possession of the ticket.

### 2. Application of the Time Limitation to Plaintiff—Other Circumstances of Possession

The more troublesome question in this case arises not with respect to the physical characteristics of the ticket, but with respect to Plaintiff's possession of the ticket. Plaintiff contends that she never received the ticket or any other notice of the limitations period. The Court has found as fact, however, that Donovan received the ticket on behalf of those passengers in his group. The issue thus becomes whether Plaintiff can be charged through her agent with receipt of the ticket and, therefore, knowledge of its terms.

Plaintiff argues that she cannot be charged with knowledge of the contractual limitations because no language on any of the documents she actually received alerted her to any special conditions; thus, Plaintiff argues, Prince of Fundy did not do all it reasonably could do to warn Plaintiff of the terms and conditions affecting her legal rights. In support of her argument, Plaintiff relies on the First Circuit's discussion in *Shankles* of *Barbachym v. Costa Line, Inc., supra,* 713 F.2d 216. The Court has reviewed these and other cases, and has determined that Plaintiff's position is correct.

In *Shankles,* a steamship passenger brought suit against the ship charterer to recover damages allegedly arising from property damage and personal injuries sustained as a result of a fire on board the ship. The First Circuit held that the provisions in the passenger ticket and passenger declaration form, together with the circumstances of the passenger's possession of and familiarity with the ticket, reasonably communicated the existence of limitations periods for giving notice of the claim and commencing the lawsuit.

In reaching its decision, the First Circuit discussed *Barbachym* as being "factually distinguishable."[9] *Barbachym* involved two plaintiff-passengers traveling as part of a tour group. The plaintiffs in that case received a boarding pass with language indicating that conditions of transportation were as per ticket held by the group leader. The Sixth Circuit found that the ocean carrier had not given reasonable notice of the one-year limitations period for bringing a death or personal injury suit. In reaching that conclusion, the court found inadequacies on the face of the ticket itself.[10] The court also found, however, that "even if a passenger were to deduce from [the boarding pass] that there might be some additional terms governing the trip, the passenger naturally would assume that only the 'Group Leader' had access to the material containing those terms." *Barbachym,* 713 F.2d at 220.

The Sixth Circuit's decision suggests that a passenger must receive direct notice of a limitations period for such a period to be legally binding. It follows that when a passenger travels as part of a group, the materials distributed to the individual passengers must clearly state the critical terms of the contract or, at least, clearly direct the individuals to documents that do set out those terms.

Defendant Prince of Fundy cites several cases for the proposition that an individual who employs an agent to receive a passenger ticket on the individual's behalf is charged with knowledge of the ticket's terms to the same extent the agent would be charged. *See, e.g., Foster v. Cunard White Star,* 121 F.2d 12 (2d Cir.1941)

---

**9.** The First Circuit indicated that its statement was not to be taken as an implied agreement that *Barbachym* was correctly decided. *Shankles,* 722 F.2d at 867, n. 3.

**10.** Specifically, the court found that the ticket face contained no conspicuous language calling attention to additional terms or to the fact that such terms were contained in the travel folder;

that the paper containing the contract was folded and stapled to the folder; that the print was extremely small; that no effort was made to explain the terms to the passenger or obtain his signature, even though space was provided therefor; and that the article on limitation of liability was the 20th of 35 articles. 713 F.2d at 220.

(plaintiff's brother purchased ticket); *Ciliberto v. Carnival Cruise Lines, Inc.*, 1986 A.M.C. 2317 (E.D.Pa.1986); *DeCarlo v. Italian Line*, 416 F.Supp. 1136 (S.D.N.Y. 1976) (plaintiff's friend purchased ticket); *Rogers v. Furness, Withy & Co.*, 103 F.Supp. 314 (W.D.N.Y.1951) (same). Defendant argues that the terms of the passenger ticket in the instant case were "reasonably communicative" in the hands of Plaintiff's agent and therefore are binding on the Plaintiff.

■ The Court rejects Defendant's argument. The cases on which Defendant relies are distinguishable from the case now before the Court in one very important respect: they all involved agents acting only for the plaintiff to procure an individual passenger ticket on a ship. The Court agrees that when a personal agent receives, *i.e.*, "picks up" an individual passenger ticket from a carrier, it is fair and reasonable to charge the passenger with legal notice of contractual limitations clearly appearing on the ticket. "To hold otherwise would permit those passengers who delegate the responsibility for acquiring and holding their tickets to others to circumvent the effect of a clearly stated, statutorily authorized limitation clause." *Ciliberto*, 1986 A.M.C. at 2321.

■ The situation is quite different, however, when a carrier books multiple reservations through a tour group and issues one "master" or group ticket to the tour leader. A warning on a *group ticket* that *each passenger* should examine the terms of contractual limitation printed on the ticket jacket is not, in this Court's opinion, reasonable notice to the individual passengers of those terms. Certainly, a carrier should foresee the likelihood that only the tour leader, rather than the individual passengers, would possess the master ticket. This is especially true when the carrier issues separate documents (boarding passes, meal vouchers, and gambling chits) to the individual passengers. The administrative convenience of issuing a group ticket does not also establish a short-cut around the carrier's legal obligation to provide passengers with notice of significant contractual limitations. It is reasonable, at the very least, to require the carrier to refer individuals to the document containing those terms and to state in clear language that the individuals have a right to examine that document. Such notice could easily be distributed with the boarding passes, for example, or could even be incorporated as part of the boarding pass itself.[11]

Defendant Prince of Fundy relies solely on the master ticket issued to Donovan as tour leader to establish notice to individual passengers. The Court concludes as a matter of law that, by relying on the master ticket, Prince of Fundy did not do all that it reasonably could have done to notify Plaintiff of the contractual limitations, and that such limitations are therefore not binding on Plaintiff. The Court will proceed to consider the merits of Plaintiff's claims.

### B. *Stairway Maintenance*

Plaintiff claims that Prince of Fundy was negligent in maintaining the stairways aboard the SCOTIA PRINCE; and that as a result of that negligence, she slipped and/or tripped, fell down the stairs, and injured her back.

The Supreme Court, formulating the standard of care owed to passengers aboard a cruise ship, has held that "the owner of a ship ... owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959).[12] The formulation of "reasonable care under the circumstances" was somewhat at odds with earlier cases describing the standard as "the highest degree of care." *E.g., The*

---

11. The individual notice should be given on a document that the passenger will retain. *See, e.g., DeNicola*, 642 F.2d at 11 (emphasizing the length of time plaintiff-passenger had possessed the ticket).

12. *Kermarec* was a social invitee case; the Supreme Court, however, rejected in dictum the distinction between a licensee and an invitee for purposes of the standard of care.

*Admiral Peoples,* 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633 (1935); *The City of Panama,* 101 U.S. (11 Otto) 453, 25 L.Ed. 1061 (1879).

The parties have not cited, nor has the Court through its own research found, any First Circuit cases decided after *Kermarec* discussing the standard of care owed to passengers. At least two circuits, however, have rejected a distinction between the standard of "very high care" and the standard of "reasonable care under the circumstances." These courts hold that although "reasonable care under the circumstances" may be a very high standard in certain situations, passengers are nevertheless owed the single duty of reasonable care. *Smith v. Southern Gulf Marine Co. No. 2, Inc.,* 791 F.2d 416 (5th Cir.1986); *Rainey v. Paquet,* 709 F.2d 169 (2d Cir. 1983). *See generally* W. Prosser, *The Law of Torts,* § 34 at 181 (4th ed. 1971).

■ Applying the standard of "reasonable care under the circumstances" to this case, the Court determines that Prince of Fundy was not negligent in maintaining its stairways. As the facts set forth above indicate, the stairs were carpeted at the time of Plaintiff's fall. Both Plaintiff's and Defendant's expert witness testified that, with carpeting, the stairway in question met or exceeded safety standards. The Court concludes, therefore, that Prince of Fundy met the standard of care and is not liable for damages as a result of Plaintiff's fall.

### C. Photographers' Conduct

Plaintiff also claims to have suffered severe physical pain and mental anguish as a result of the photographers' conduct. She seeks compensation and punitive damages for the alleged intentional and/or negligent infliction of emotional distress.

Before reaching the merits of Plaintiff's emotional distress claim, the Court must first determine whether Prince of Fundy was legally responsible for the photographers' conduct.[13] Plaintiff asserts that Prince of Fundy, as bareboat charterer, was responsible for the photographers' actions and that the "borrowed servant" rule applies. Defendant Prince of Fundy, on the other hand, asserts that the photographers were independent contractors employed by Intermed, and that Prince of Fundy cannot be held responsible for the photographers' conduct.

■ It is a fundamental principle of maritime law that a carrier has unconditional responsibility for the misconduct of its people toward the passengers. G. Gilmore & C. Black, Jr., *The Law of Admiralty,* § 1–10 at 23 n. 77 (2d ed. 1975) [hereinafter cited as Gilmore & Black]. *See, e.g., Avera v. Florida Towing Corp.,* 322 F.2d 155 (5th Cir.1963); *Farmer v. O/S FLUFFY D,* 220 F.Supp. 917 (S.D.Tex.1963). Moreover, a bareboat charterer is looked to as the owner of the vessel *pro hac vice,* with certain consequences of ownership attaching as a result. Thus, "[t]he vessel, so far as third persons are concerned, is his vessel, and the men are his men; such of their defaults as are attributable to the owner and employer under *respondeat superior* doctrines are his to answer for." Gilmore & Black, § 4–23 at 242.[14]

■ Applying these principles to the facts of the case now before it, the Court concludes that Prince of Fundy was responsible for the photographers' conduct. First, Prince of Fundy listed the two photographers on its crew list. This fact alone suggests that Prince of Fundy itself considered Ayling and Moore to be part of its crew. Second, Prince of Fundy was responsible for the photographers' presence on the SCOTIA PRINCE, in the sense that Prince of Fundy supervised the ship's operation and consented, at least impliedly, to the photographers' presence. Regardless

---

13. It appears to the Court that Plaintiff might have been wise to name Intermed and the photographers individually as defendants. Nevertheless, the Court will proceed to determine Prince of Fundy's responsibility.

14. Both parties have cited state law relating to the master-servant/independent contractor distinction. Because federal maritime law provides an applicable rule, the Court finds it unnecessary to look to state law. *See* Gilmore & Black, § 1–17 at 47–50. *See also infra* note 15.

of whatever contractual agreements existed between Prince of Fundy, Floating Fleet, and Intermed, it is clear to the Court that Prince of Fundy was the party with ultimate responsibility on board the SCOTIA PRINCE. Finally, the photographs were taken for commercial exploitation in the pecuniary interests of Prince of Fundy and/or its agent, Floating Fleet. Because Prince of Fundy stood to profit from the photographic concession, the Court finds it just and reasonable to hold Prince of Fundy responsible for the concession's operation.[15]

■ The Court turns, then, to consider Plaintiff's claim for infliction of emotional distress. The Court must apply Maine law to determine the merits of the claim.[16]

Maine has adopted the position set out in section 46 of the *Restatement (Second) of Torts* on the intentional infliction of emotional distress.

> Specifically, in order to recover for the intentional infliction of emotional distress, a plaintiff must establish that (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct ...; (2) the conduct was so "extreme and outrageous" as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community" ...; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "severe" so that "no reasonable [person] could be expected to endure it."

*Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me.1979) (citations omitted). *See also Rubin v. Matthews International Corp.*, 503 A.2d 694, 699 (Me.1986). The Court will consider each of these elements in turn.

■ The first element focuses on the defendant-actor's state of mind: the defendant must have acted "intentionally or recklessly," or have been "certain or substantially certain" that his or her conduct would cause the plaintiff severe emotional distress. In the present case, the Court finds clear evidence that this element is

---

**15.** Even if the Court were to analyze Plaintiff's claim based on master-servant or independent contractor status, *see supra* n. 14, the Court would still conclude that Prince of Fundy was responsible for the photographers' conduct. Courts have set forth a number of factors useful in resolving the servant/independent contractor issue. These factors include degree of control, whether the employee is engaged in a distinct business, length of employment, and method of payment. *See* W. Prosser, *Law of Torts*, § 70 at 460 (4th ed. 1971). Prosser also states, however, that "it is probably no very inaccurate summary of the whole matter to say that the person employed is a servant when, in the eyes of the community, he would be regarded as a part of the employer's own working staff, and not otherwise." *Id.* Applying this test to the present case, the Court concludes that, in the eyes of the community, the photographers would be considered part of Prince of Fundy's working staff.

**16.** This case is clearly within the Court's admiralty jurisdiction. *See, e.g., Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *Kermarec, supra*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550. Admiralty jurisdiction, however, does not necessarily demand the application of maritime law. The Supreme Court has recognized the "maritime but local" doctrine. *Kossick v. United Fruit Co.*, 365 U.S. 731, 738, 81 S.Ct. 886, 892, 6 L.Ed.2d 56 (1961). Under this doctrine, a court may properly apply state law if that application would not disturb the uniformity of maritime law. *Id.* In other words, "the states may not flatly contradict established maritime law, but may 'supplement' it...." Gilmore & Black, § 1–17 at 50. *See also S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160 (5th Cir. 1979); *Kozoidek v. Gearbulk, Ltd.*, 481 F.Supp. 513 (D.Md.1979). Applying these principles to the present case, the Court determines that it should apply Maine law to resolve Plaintiff's claim. First, the parties' briefs and the Court's independent research suggest that neither statutes, regulations, nor maritime custom establish a rule of law on the infliction of emotional distress issue. *See S.C. Loveland, Inc.*, 608 F.2d at 165. Second, Maine law, as the law of the forum state, is an appropriate choice. *See Kozoidek*, 481 F.Supp. at 516. Finally, Maine has a compelling interest in holding all entities with significant contacts in Maine to a uniform standard of care. Plaintiff's claim for infliction of distress does not present a tort unique to maritime interests; rather, it presents the same "land-based" interest that would be presented if the photographers had been operating their concession in a hotel lobby. The Court finds that absent a unique maritime interest, an interest in the uniformity of state law counsels application of Maine law.

satisfied. Plaintiff indicated continuously, beginning with her very first encounter with the photographers, that she did not wish to have her picture taken. Her initial reaction—*i.e.*, her adamant statement that she did not like being photographed—was itself enough to suggest that, at the very least, the photographers were "certain or substantially certain" that future attempts to photograph Plaintiff would cause her severe emotional distress.[17] The photographers' continued harassment and taunting remarks lead the Court to conclude that the photographers' conduct was in fact intentional.

■ The second element goes to the nature of the conduct: the degree to which the conduct was "outrageous." *Vicnire* and section 46 of the *Restatement (Second) of Torts* suggest a rather rigorous test for "outrageousness." Comment *f* to that section, however, also makes clear that "[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is particularly susceptible to emotional distress...." Again, the Court concludes that Plaintiff's initial reaction to having her picture taken indicated a particular sensitivity. The Court can perceive no valid rationale for a carrier or its agent to insist on taking photographs of a passenger over the passenger's objection, especially when the photographs are taken in the pecuniary interests of the carrier or its agent. Furthermore, the offensive conduct did not end with the initial encounter: the photographers continued to approach Plaintiff, take her picture, and make lewd comments. The Court finds the photographers' conduct, taken as a whole, to be so reprehensible as to meet the requirement of "outrageous" or "atrocious" conduct.

■ The third element requires a causal connection between the Defendant's actions and the Plaintiff's emotional distress. Here the Court finds that Prince of Fundy has little room to quibble. The evidence at trial overwhelmingly showed that Plaintiff suffered emotional distress as a result of the photographers' conduct. Plaintiff was distressed not only by having her picture taken, but also by seeing the "doctored" photograph and a photograph of her standing with her back to the camera displayed for all passengers to see. Plaintiff also experienced distress due to the continued confrontations and rude comments. Even if Plaintiff's fall contributed in some way to her emotional distress, the Court nevertheless concludes that, to a significant degree, Plaintiff's emotional distress was caused by the photographers' conduct.

The fourth and final element focuses on the degree of Plaintiff's emotional distress. *Vicnire* established that the emotional distress must be "severe" so that "no reasonable [person] could be expected to endure it." 401 A.2d at 154. The Maine Supreme Judicial Court expressly added, however, that " 'shock, illness, or other bodily harm' ... is not an absolute prerequisite for recovery of damages for intentional, as opposed to negligent, infliction of emotional distress," and that "[i]n appropriate cases, 'severe' emotional distress may be inferred from the 'extreme and outrageous' nature of the defendant's conduct alone." *Id.*, citing *Restatement (Second) of Torts*, § 46, Comment *k*. Initially, the Court notes its objection to Defendant's characterization of the photographers' conduct as "mildly annoying." As explained above, Plaintiff presented more than enough evidence to take her beyond annoyance to the level of emotional distress. Furthermore, the Court finds this an appropriate case in which to infer severity from the extreme and outrageous nature of the photographers' conduct alone. Again, this case does not involve a single act of objectionable conduct. Rather, it involves the photographers' persistent pursuit of Plaintiff, their taking her picture over her repeated objections, and, worst of all, the making of comments which this Court finds extremely offensive. The Court therefore concludes

---

17. The degree of severity required is discussed *infra* (the fourth element of the *Vicnire* test). The first element addresses the actor's state of mind, apart from the severity of the emotional distress.

that Plaintiff's emotional distress met the level of severity required by *Vicnire.*

Having satisfied all four elements, the Court holds that Plaintiff is entitled to recover on her claim for intentional infliction of emotional distress.

Turning to the claim for negligent infliction of emotional distress, the Court finds Plaintiff's position to be without merit. To recover for negligent infliction of emotional distress under Maine law, a plaintiff must show, in addition to mental distress, either accompanying physical consequences or an independent underlying tort. *Rubin*, 503 A.2d at 698; *see also Packard v. Central Maine Power Co.*, 477 A.2d 264, 268 (Me.1984); *Culbert v. Sampson's Supermarkets, Inc.*, 444 A.2d 433 (Me.1982). In this case, Plaintiff has established neither of these requirements.

Plaintiff testified at trial that, as a result of the photographers' conduct, she had had nightmares and experienced trauma whenever she recounted her trip on the SCOTIA PRINCE. On cross-examination, however, Defendant introduced Plaintiff's deposition testimony indicating that she had *not* had nightmares and that she had suffered emotional but not physical effects. Muratore Dep. at 75–76. Although the Court does not question Plaintiff's emotional distress, it cannot find, based on the evidence presented, that Plaintiff suffered the physical consequences necessary to impose liability for a negligence-based tort.

Likewise, the Court rejects Plaintiff's argument that she has suffered an invasion of privacy constituting an independent underlying tort. Plaintiff relies on *Estate of Berthiaume v. Pratt*, 365 A.2d 792 (Me.1976), and argues that the photographers' taking her picture was an intrusion upon her physical and mental solitude or seclusion.[18] Based on the Maine Supreme Judicial Court's later opinion in *Nel-*

son v. Maine Times*, 373 A.2d 1221 (Me. 1977), and on the Comments to section 652B of the *Restatement (Second) of Torts*, the Court finds no merit in Plaintiff's claim for invasion of privacy.

In *Estate of Berthiaume*, the defendant physician made an uninvited entry into a dying person's hospital room and, without authorization, took pictures of the patient. At the close of all evidence, the trial court directed a verdict in favor of the defendant, and ·the administratrix of the decedent's estate appealed. For the first time, the Maine court recognized a "right to privacy" and declared that a violation of that right constitutes an actionable tort. In sustaining the appeal, the court stated:

> The jury had a right to conclude from the evidence that plaintiff's intestate was dying. It could have concluded he desired not to be photographed in his hospital bed in such condition and that he manifested such desire by his physical motions. The jury should have been instructed, if it found these facts, that the taking of pictures without decedent's consent or over his objection was an invasion of his legally protected right to privacy, which invasion was an actionable tort for which money damages could be recovered.

If the Maine court's description of the nature of the intrusion required to establish invasion of privacy was less than specific in *Berthiaume*, the court clarified its position in *Nelson v. Maine Times*. In *Nelson*, a mother and her infant son sued the defendant newspaper for invasion of privacy; plaintiffs claimed that the newspaper's unauthorized publication of the infant son's picture intruded on the seclusion of his private life. The trial court granted defendant's motion to dismiss for failure to state a claim upon which relief could be granted. Plaintiffs' appeal was denied by the Maine Supreme Judicial Court, which

---

**18.** The law of privacy is generally recognized to include four distinct interests: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of the other's name or likeness; (3) unreasonable publicity given to the other's private life; and (4) publicity that unreasonably places the other in a false light before the pub-

lic. *Restatement (Second) of Torts*, § 652A; *Nelson v. Maine Times*, 373 A.2d 1221, 1223 (Me. 1977); *Estate of Berthiaume*, 365 A.2d at 795. Plaintiff presses only the first of these enumerated interests, and the Court declines to address the others.

stated that "a complaint should minimally allege a *physical intrusion* upon premises occupied privately by a plaintiff for purposes of seclusion." 373 A.2d at 1223 (emphasis added). The court distinguished *Berthiaume* on the fact that the defendant in that case had made an uninvited entry into the plaintiff's decedent's hospital room.

*Nelson* relied in large part on the *Restatement (Second) of Torts*, and the Court likewise looks to that source for guidance. Section 652B describes the "intrusion upon seclusion" tort that Plaintiff alleges in this case. An illuminating comment especially significant to Plaintiff's claim states:

> The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs. Thus there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection. *Nor is there liability for observing him or even taking his photograph while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye.*

*Restatement (Second) of Torts*, § 652B, Comment *c* (emphasis added).

The *Nelson* decision, together with section 652B and its accompanying comments, suggest that "intrusion upon seclusion" requires a physical intrusion, or at least an intrusion into a physical realm that is uniquely the plaintiff's.[19] In the present case, this requirement is not met. Although the photographers harassed Plaintiff on several occasions, no evidence suggests that the harassment occurred in any area of Plaintiff's "private seclusion." Rather, the encounters were on the loading deck, in the cafeteria, and at other places on the SCOTIA PRINCE open to all passengers. There has certainly been no suggestion that the photographers entered Plaintiff's cabin, nor has Plaintiff alleged assault and battery. The Court therefore concludes that Plaintiff cannot establish invasion of privacy as an underlying tort. Because she also has not established accompanying physical consequences, her claim for negligent infliction of emotional distress must fail.

## IV. DAMAGES

The Court's only remaining task is to determine an appropriate measure of damages for the one claim on which Plaintiff has prevailed: intentional infliction of emotional distress. Plaintiff seeks compensatory damages in the amount of $25,000 and exemplary damages in the amount of $150,000.

The purpose of a civil tort action "is to compensate [the injured person] for the damage he has suffered, at the expense of the wrongdoer." W. Prosser, *Law of Torts* § 2 at 7 (4th ed. 1971). Intentional or deliberate wrongdoing may give rise to punitive, or exemplary, damages. "Such damages are given to the plaintiff over and above the full compensation for his injuries, for the purpose of punishing the defendant, of teaching him not to do it again, and of deterring others from following his example." *Id.* at 9 (footnote omitted.)[20]

Once damage has been established in a nonjury trial, the trial judge has considerable discretion in fixing the amount of damages. *Rivera Morales v. Benitez de Rexach*, 541 F.2d 882, 886 (1st Cir.1976). In this case, the Court has had an opportunity to observe the Plaintiff on the witness stand as she recounted her experience on board the SCOTIA PRINCE. Plaintiff's embarrassment and humiliation are without doubt real and substantial.

---

19. *See, e.g., Restatement (Second) of Torts,* § 652B, Comment *b* (use of defendant's senses, as with binoculars or wiretapping used to monitor plaintiff's private affairs, constitutes invasion; opening private mail constitutes invasion).

20. Punitive damages are available under the general maritime law. *See Protectus Alpha Navigation Co. v. North Pacific Grain Growers, Inc.,* 767 F.2d 1379, 1385 (9th Cir.1985), and cases cited therein; *Pino v. Protection Maritime Insurance Co.,* 490 F.Supp. 277 (D.Mass.1980).

Given the special duty owed by a carrier to its passengers, Plaintiff had a right to expect a great deal more courtesy and consideration from Prince of Fundy than she has received. In light of all the circumstances, the Court finds appropriate an award of Five Thousand Dollars ($5,000.00) in compensatory damages.

Turning to exemplary damages, the Court has determined that a substantial award is appropriate. First, the Court points once again to the carrier's special duty to its passengers and suggests that this case presents a significant departure from that duty. Second, the Court has found the photographers' conduct to be intentional and deliberate. Third, the Court is not aware that Prince of Fundy did anything, even after the situation was brought to its attention, to discipline the photographers. Throughout the trial and in its post-trial brief, Prince of Fundy has continued to ignore the photographers' crass comments, focusing instead on Plaintiff's desire not to be photographed and describing the photographers' conduct as "mildly annoying." Prince of Fundy has demonstrated a disturbing lack of sensitivity to its duty to provide safe carriage to those who contract and pay for passage aboard its ship. Finally, in awarding exemplary damages, a court may and should consider what amount will deter the improper conduct in the future. A significant award of punitive damages will serve as a message to this and all carriers that a carrier bears responsibility for its crew in a realistic sense of the word, not in some narrowly defined sense based on technical relationships.

For the foregoing reasons, the Court awards Plaintiff Twenty-Five Thousand Dollars ($25,000.00) in exemplary damages.

So ORDERED.