In re LITIGATION INVOLVING AL-
LEGED LOSS OF CARGO FROM TUG
ATLANTIC SEAHORSE, "SEA BARGE
101" BETWEEN PUERTO RICO AND
FLORIDA IN DECEMBER 1988.

MDL No. 828.
Civ. Nos. 89–1107, 89–1652, 90–1895
and 90–2420 to 90–2423.

United States District Court,
D. Puerto Rico.

Aug. 19, 1991.

Cordero, Miranda & Pinto, Keith A. Graffam, Old San Juan, P.R., for plaintiffs in No. Civ. 89–1107.

Underwood, Gillis & Karcher, P.A., Andrew W. Anderson, Miami, Fla., for plaintiffs in No. Civ. 90–1895.

José F. Sárraga, San Juan, P.R., for Marine Transp. Services Sea Barge.

Calvesbert & Brown, José E. Alfaro Delgado, San Juan, P.R., and Hayden & Milliken, P.A., Jan M. Kuylenstierna and Robert W. Blanck, Miami, Fla., for Transconex, Inc. and AIM Caribbean Express, Inc.

Law Offices of Lee H. Schillinger, Lee H. Schillinger, Coral Gables, Fla., for plaintiffs in No. Civ. 90–2420.

Mitchell, Harris, Horr & Associates, P.A., David J. Horr, Miami, Fla., for plaintiffs in No. Civ. 90–2421.

Waks & Barnett, P.A., Andrew L. Waks, Miami, Fla., for plaintiffs in No. Civ. 90–2422.

Armstrong & Mejer, P.A. by Alvaro L. Mejer, Coral Gables, Fla., and José F. Sárraga, San Juan, P.R., for Sea Barge Group, Inc. and Marine Transp. Services Sea Barge.

Robert Lamar Bell, Miami, Fla., and Bird Bird & Hestres, Antonio M. Bird, Jr., San Juan, P.R., for plaintiffs in No. Civ. 90–2423.

Golman Antonetti, Juan H. Saavedra, San Juan, P.R., for plaintiffs in No. Civ. 89–1652.

## OPINION AND ORDER

FUSTE, District Judge.

In December of 1988, M/V Barge No. 101 was en route from San Juan, Puerto Rico, to Miami, Florida, carrying cargo. Nineteen containers of cargo were lost overboard, setting off a series of actions against the barge owner, Sea Barge Group Inc. ("Sea Barge"), and Sea Barge's insurance company, Fireman's Fund Insurance Companies (Fireman's Fund). Complaints were filed in both Florida and Puerto Rico, and the matter was eventually consolidated as a Multidistrict Litigation before this court. Settlements have occurred or have been promised in three of the original filings (90–1895, 90–2422, and 90–2423). In a fourth case, 90–2420, the parties expect to settle, and there are no dispositive motions which need our attention.

Three other cases have pending motions that we dispose of by way of today's order. The motion in the first case (90–2421, MDL Docket No. 53) deals with whether Fireman's Fund can be sued directly by a cargo owner (now in the form of a subrogated insurance company) under Puerto Rico's direct action statute. The insurance question rests on a difficult choice of law analysis. The motion in the second case (89–1107, MDL Docket No. 56)[1] deals with the same insurance question as to the direct action statute, and also asks us to determine whether an owner of goods in fact became an "insured" under a Fireman's Fund policy merely by signing a bill of lading with Sea Barge. Though the parties

assert that they expect this third case to settle, no final settlement statement has been made and we rule now on the motion in anticipation of that settlement.[2] The motions in the third case (89–1652, MDL Docket Nos. 94 & 95) deal with whether Sea Barge and Fireman's Fund can amend their counterclaims at this late date. We take up the three motions in turn.

### Fireman's Fund's Motion Against INA

Under Civil No. 90–2421, Insurance Company of North America (INA) paid off certain owners of cargo for their loss, exercised its right to subrogation, and sued Sea Barge, Ayala, and Fireman's Fund. As to Fireman's Fund, the complaint alleged a right to sue not as an insured under any policy, but rather under the Direct Action statute of Puerto Rico, 26 L.P.R.A. §§ 2001 et seq., which gives the injured party the right to sue a legal liability insurer directly. Since we find that Florida, rather than Puerto Rico law must direct this decision, and since Florida law does not allow for direct action by a non-insured against a legal liability insurer for the acts or omissions of the insured, we grant Fireman's Fund's motion to dismiss as to it.

INA unambiguously invoked this court's maritime jurisdiction, 28 U.S.C. § 1333 (see Amended Complaint (MDL Docket No. 52)). Although ordinarily uniform rules are applied in admiralty jurisdiction, the Supreme Court has mandated the adoption by the court sitting in admiralty of state law in the area of maritime insurance contracts, in the absence of a controlling federal rule. *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). "Federal admiralty law confers no general

---

**1.** Although technically MDL Docket No. 56 does not include Index No. 89–1107 in its caption, it is clear that all of AIM's third-party complaints, whatever their index numbers, were intended to be included in Fireman's Fund's omnibus dismissal motion. AIM itself has treated MDL Docket No. 56 in that fashion. We note, for instance, that AIM moved, in MDL Docket No. 67, for more time to reply to Fireman's Fund's motion, and, in the motion for more time, included 89–1107 in the caption. By so doing, we find that AIM recognized that MDL Docket No.

56 ran against Index No. 89–1107, as well as the numbers actually listed.

**2.** On August 2, 1991, we granted the parties until August 7, 1991 to report on all final settlements. We had announced our readiness to rule on pending matters. We agreed to hold back our ruling until August 7, in order to avoid passing upon a matter rendered moot by settlement. Today we rule only on matters which the attorneys could not resolve finally before the August 7th date.

right to sue an insurance company directly [citation omitted] nor does it contain any specific bar against such an action." *Steelmet, Inc. v. Caribe Towing Corp.*, 779 F.2d 1485, 1487 (11th Cir.1986). Since some states allow such direct actions, and others do not, the question then arises as to which state's law should apply. Where the state law is being adopted by the federal court under its admiralty jurisdiction, and not simply as an exercise of diversity jurisdiction, a federal choice of law rule must be applied in choosing which state substantive law should be adopted. *State Trading Corp. v. Assuranceforeningen Skuld*, 921 F.2d 409 (2nd Cir.1990). In *State Trading*, the court was sitting in admiralty and was faced with the question of whether the Connecticut direct action statute should be applied to allow an action against a marine insurance company. The court noted that the rule of *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), which requires federal district courts to look to the choice of law rule of the state in which they sit, applies only to a federal court sitting in diversity. The *State Trading* court therefore accepted the irony, as do we, that while a federal court exercising its admiralty jurisdiction over a maritime insurance dispute must seek a state rule as to the availability of direct action, it must look to a federal rule of choice of law in order to find the correct state rule.

### Choice of Law in Diversity as Opposed to Admiralty

█ We note in passing that the issue might be very different if the plaintiffs invoked the diversity jurisdiction of the court, and maintained the state direct action claim as a separate action parallel to the substantive admiralty claim. (It is not always so easy to determine on which side

of the admiralty/diversity law fence a claim is meant to fall, *Austin v. Unarco Industries, Inc.*, 705 F.2d 1, 6, n. 1 (1st Cir.1983); *Ramos v. Continental Insurance Company*, 493 F.2d 329 (1st Cir. 1974), but in this case the pleading leaves no question but that diversity jurisdiction is *not* being invoked). If the plaintiff had proceeded on the direct action statute under diversity, the court would need to look to the local choice of law rules of the state in which it is sitting to determine which state direct action statute would apply. In one First Circuit case, for instance, the court did not specifically address the choice of law question, but it did hold that an action under the Rhode Island direct action statute could be pursued as a separate state law claim *qua* state law claim, alongside the underlying admiralty dispute so long as the court's diversity jurisdiction had been invoked as the basis for the direct action claim. *Pace v. Insurance Co. of North America*, 838 F.2d 572 (1st Cir. 1988). The First Circuit has specifically recognized that the Puerto Rico direct action statute creates a substantive state law right which may stand on its own. *Ruiz Rodríguez v. Litton Industries Leasing Corp.*, 574 F.2d 44 (1st Cir.1978). It stands to reason that where the direct action statute is invoked independently under state law and is not merely adopted as federal law, the court would have to behave as a proper diversity court and apply *Klaxon*.[3]

### Which Federal Choice of Law Rule?

█ Having determined that a federal choice of law rule applies, however, only leads us to a new problem in this hydraheaded choice of law question. This matter came to us as a matter of multidistrict litigation consolidation from a federal district court in Florida, sitting in the Eleventh Circuit. In other words, we have these matters more as a convenience to the

---

**3.** On at least one occasion the First Circuit has been able to avoid the question of how to approach choice of law in the context of state law causes of action arising out of the same facts and litigated parallel to an admiralty action. *Muratore v. M/S Scotia Prince*, 845 F.2d 347, 352 (1st Cir.1988). In *Muratore*, the circuit noted but would not comment on the correctness

of the district court's application of Maine law to a claim of intentional infliction of emotional distress which was litigated along with and arising out of the same facts as an admiralty claim. The district court arrived at its decision to apply Maine law because that was the "law of the forum state." *Muratore v. M/S Scotia Prince*, 656 F.Supp. 471, 480, n. 16 (D.Me.1987).

federal court system than for any substantive venue purpose or because the litigants chose to litigate here. In the case of transfers between districts sitting in diversity for a change of venue under 28 U.S.C. § 1404(a), the rule of *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), applies and requires that the transferee district court rule exactly as if it were sitting in the same state as the transferor court. The rule assures that the " 'accident' of federal diversity jurisdiction does not enable a party to utilize a transfer to achieve a result in federal court which could not have been achieved in the court of the State where the action was filed." *Van Dusen,* 376 U.S. at 637–39, 84 S.Ct. at 819–21. The decision is driven by the *Erie* doctrine. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

▇▇▇ No such similar state/federal concerns are present in the transfer of an action based on federal law pursuant to a multidistrict litigation order (and although we ultimately seek a state rule, we have already determined that the state rule here merely operates as an extension of the federal admiralty jurisdiction, not as an independent state rule). In *In re Korean Air Lines Disaster of September 1, 1983,* 829 F.2d 1171 (D.C.Cir.1987), the D.C. Circuit faced the question of which circuit's federal law a district court should apply after receiving the transfer: the law of the circuit of the transferor district or of the transferee district. The D.C. Circuit determined that while the transferee court should consider the law of the transferor circuit, it would ultimately be bound only by the law of its own circuit. The court held that all federal courts are considered to be competent to rule "correctly" on issues of federal law, and that at least in fiction all federal courts are assumed to be applying a unitary body of law. The court pointed out that splits in the circuits, at least in theory, are to be resolved by the Supreme Court. We add to that analysis the point that even without Supreme Court intervention, the "competition" of legal theories in the circuits sometimes results in sounder legal theories winning out against less workable ones, causing some circuits to change their tune and follow the path set by their neighbors. The ultimate point is that neither party in a multidistrict transfer which crosses circuit boundaries has any legitimate interest in seeing the federal choice of law rules of the circuit in which the case originated follow the case to the transferee circuit. A transferee district court is bound, ultimately, to follow only the law of its own circuit court and the Supreme Court, and that law must be presumed to be as "correct" a statement of federal law as that of the transferor circuit.

The question of whether we should apply Eleventh Circuit precedent on choice of law in marine insurance cases or First Circuit law is not an academic one. The Eleventh Circuit choice of law rule favors applying the law of the "state where a marine insurance contract is issued and delivered." *King v. Allstate Insurance Co.,* 906 F.2d 1537 (11th Cir.1990); *Eagle Leasing Corp. v. Hartford Fire Ins. Company,* 540 F.2d 1257 (5th Cir.1976) ("In the absence of specifically controlling federal authority, the law of the state where a marine insurance contract is issued and delivered governs the construction of its language."). (The Eleventh Circuit adopts precedents from the Fifth Circuit for the period prior to the creation of the Eleventh Circuit). Since at least some of the contracts were signed and issued in New York, Eleventh Circuit precedent might well require us to apply New York law to the interpretation of the contract and the question of direct action.

▇▇▇ The First Circuit, on the other hand, has not directly spoken on the issue of choice of law on marine insurance contracts, leaving us free to adopt the law of other courts. With the exception of the Fifth and Eleventh Circuits, other courts seem to apply more of a significant contacts or nexus test. *State Trading,* 921 F.2d at 409; *Healy Tibbitts Construction Co. v. Foremost Ins. Co.,* 482 F.Supp. 830, 835 (N.D.Cal.1979) ("Law of the state with most significant nexus with the insurance contract."). We adopt that approach.

■ Sea Barge has its center of operations in Florida. The policy lists Sea Barge as the insured with a Florida address. The goods were to be received in Florida. We do not see the fact that the goods were sent from Puerto Rico to be enough to overcome the fact that the contract itself was to insure a Florida-based concern. We think that Florida has the most significant contacts with this contract, and we believe that the law of this circuit should dictate the application of substantive Florida law on the availability of direct action against a legal liability insurer.

■ Florida does not recognize a direct action against an insurance company by a non-insured. *National Corporación Venezolana, S.A. v. M/V Manaure*, 826 F.2d 6 (11th Cir.1987). Here plaintiff's entire case against Fireman's Fund is premised on the applicability of Puerto Rico's Direct Action statute, and specifically states that it is against Fireman's Fund in its capacity as a legal liability insurer. Plaintiff alleges no other basis for recovery at this time against Fireman's Fund. Therefore, plaintiff's cause of action in Civil No. 90–2421 against Fireman's Fund cannot stand, and Count III of the complaint ("Relief Against Fireman's Fund Insurance Company") is dismissed.

### *AIM v. Fireman's Fund: Motion to Dismiss Third Party Defendant*

Civil No. 89–1107, although expected to settle, has a pending motion to dismiss the third-party complaint. In Civil No. 89–1107, the shipping company to whom the owner consigned the goods, A.I.M. Caribbean Express ("AIM"), was sued as a defendant. AIM, as third-party plaintiff, sued Fireman's Fund as third-party defendant. The pending motion was filed by Fireman's Fund to dismiss AIM's complaint against it. Just as in Civil No. 90–2421, Fireman's Fund's motion alleges that Florida law applies and that Fireman's Fund cannot be forced to answer as a legal liability insurer to AIM, since the only insured under the legal liability insurance policy is Sea Barge. We agree for the reasons set out in the discussion regarding Civil No. 90–2421.

AIM, however, complicates the matter by claiming that they, as shipper, were actually "insureds" under the open cargo policy which Sea Barge held by virtue of signing bills of lading which, according to AIM, automatically entitled them to $100,000 of direct coverage insurance by Fireman's Fund. On this theory, of course, they need no direct action statute, because they can claim as an insured.

Generally when cargo is placed for transportation with a maritime carrier, a familiar insurance set-up is followed. In fact, the very principle of uniformity in admiralty law has been incorporated to a great extent into the business of insuring marine cargo for transportation, resulting in insurance schemes that are generally predictable.

■ Usually the sponsor of a maritime adventure who places his ship in the flow of commerce insures his financial integrity through the protecting and indemnity type of insurance. This type of insurance policy is usually issued to a shipowner by a "P & I" organization called a P & I Club. The policy acts as a legal liability insurance, covering the owner for liabilities to cargo interest, injured employees or third parties suffering damage, as in the case of an oil spill. P & I insurance is based on the theory that the shipowner, following a mishap, will pay his liability and then turn to the P & I Club for reimbursement.

■ There is also so-called "all-risks" insurance. A shipper or owner of goods can take out all-risk insurance to cover any risks which might befall the cargo while it is in voyage. The shipper or owner of cargo will deal with his own insurance company completely independently of the shipowner, to acquire an all-risks policy and thereby protect the cargo interest. The policy covers loss no matter the reason and no matter whether the shipowner was at fault or not.

■ Another type of policy is the "open-marine" policy. This policy is taken out by shipowners so that they can offer cargo coverage to shippers or cargo owners who may not have their own all-risk insur-

ance on the goods being shipped. The open marine policy works this way. Let us suppose that a small factory is going to ship a trailer load worth of its cargo. This factory wishes to cover the cargo under a marine insurance that will pay him in the event of loss whether the shipowner is at fault for the loss or not. Upon delivering the cargo for transportation, he so declares his desire and if the carrier has an open marine policy, the carrier then includes him through the payment of a fee or insurance premium in the benefits of that policy. The open marine policy is otherwise dormant and its coverage is not triggered unless the carrier has elected, at the request of the shipper, to sell insurance to that particular shipper. The terms of this kind of insurance are usually contained in the open marine policy document and for purposes of advising the public of the basic terms of insurance, the terms are spelled out in the maritime carrier's freight tariff, which is the document that announces to the general public the conditions and fees in the business at a given time.

The P & I policy is not all risk. Protecting and indemnity only pays for the legal liabilities of the shipowner. If the shipowner is found exempt from liability as in the case of an act of God or perils of the sea, then the P & I policy will not pay. Only an open marine policy or all-risk marine policy will pay.

With these basic principles in mind, we look to the facts of this case. Here it is clear that Sea Barge holds a legal liability policy. But since the Puerto Rico direct action statute does not apply (see discussion, *supra*) none of the shippers or owners here can claim directly against the insurance company on that policy. The question arises as to whether AIM (the shipper) is an insured under the open marine policy or not.

The problem with resolving the issue as to who is an insured and who is not under this open marine policy is that the parties here have provided the court with only partial documents, bits and pieces of the relevant insurance contracts, one or two sheets of bills of lading. It is impossi-

ble for us to piece together the interweaved insurance policies as they affect the parties in this case. It is simply impossible to tell, on the basis of the documents submitted to us, whether the $100,000 worth of insurance referred to in the bill of lading entitled the shipper to automatic coverage under the Fireman's Fund open marine policy, or whether, instead, such coverage would only come into play if the shipper specifically requested such coverage. The matter is further complicated by the fact that Fireman's Fund issued both the legal liability contract and the open cargo policy. Fireman's Fund argues that the "indirect" coverage afforded AIM under the legal liability policy is "other insurance" precluding the possibility of application of the open cargo policy to AIM even if one assumes that AIM is an insured under the open policy. We do not have enough of the documentary material we need to deal with this issue. We hold that the motion by Fireman's Fund to dismiss the Third–Party Complaint is granted to the extent of dismissing AIM's claim so far as it seeks recovery on a direct action statute theory against Fireman's Fund on Sea Barge's legal liability policy due to the inapplicability of Puerto Rico law as set out above. Fireman's Fund's motion to dismiss AIM's claim as an "insured" under the open marine policy is denied. The issue, if the case does not settle, will be dealt with at trial.

### *Amendments to Counterclaims, Civ. No. 89–1652*

The third case, 89–1652, involves a suit by Pre Fab Millwork Unlimited Corporation ("Pre Fab") against Sea Barge and Luis A. Ayala Colón Sucesores, Inc. ("Ayala") (Sea Barge's loading stevedore) for the loss of certain lumber that Pre Fab sent on the ill-fated voyage. Pre Fab delivered the lumber on two flatbeds that were loaded onto the barge. Sea Barge claimed in its original answer and counterclaim that Pre Fab had "under-declared" the weight of the flatbeds and the lumber contained within them, and that such under-declaration had caused the loss of not only Pre Fab's flatbeds, but all the cargo which fell into the sea on the day that cargo was lost. In

other words, Sea Barge claimed that its placement and securing of the cargo on board was done in reliance on the false low weight declarations by Pre Fab. Since the Pre Fab cargo was actually much heavier than reported, the entire load on the barge was unstable, causing the eventual accident.

After discovery, Sea Barge wishes to amend its counterclaim to allege not that the weights were under-declared, but that they were not declared at all. According to Sea Barge, the flatbeds were filled with Ipe and Imbuia woods, which are two to three times heavier than the scrap lumber usually carried by Sea Barge. According to Sea Barge, the extra-heavy wood constituted a hazard, since Sea Barge and Ayala, faced with no weight declaration, would have assumed that the load was the weight of the type of wood normally carried by them. Therefore, according to Sea Barge, Pre Fab had a duty to warn Sea Barge and Ayala of the particularly heavy nature of the cargo, since the hazard was one that neither Sea Barge nor Ayala were aware of or could reasonably have been expected to be aware of.

Plaintiff seeks to avoid the amendment to the counterclaim by arguing that in order to answer this new counterclaim, it (plaintiff) would have to depose once again virtually all of the Sea Barge/Ayala personnel in order to elicit information as to whether the weight of the wood was a factor that Sea Barge/Ayala knew or could have been reasonably expected to know.

■ We think that Sea Barge's newly advanced theory is doomed. The idea that the stevedore and barge owner could be consigned flatbeds with no declared weight, load them, and then claim that the consignor caused the accident by failing to declare a weight seems preposterous. We do not think that any purpose would be served, however, by denying the amendment at this point. No one is helped by allowing Sea Barge to go to trial on Sea Barge's original theory that a false weight was declared when all sides seem to agree that that is not what transpired. Pre Fab has been on notice since the beginning of the litigation that the declarations of weight regarding the flatbeds was at issue, and it could have prepared during discovery for any reasonable variations on that theme. At any rate, we see little prejudice even if Pre Fab did not specifically prepare for that theory since it seems like one which can be dealt with easily at trial.

Fireman's Fund, as Sea Barge's insurer, also seeks to amend its pleading to include the "new" theory. The motion is granted for the same reasons.

■ Fireman's Fund also seeks, however, to amend their counterclaim to include a claim against Pre Fab for sums which Fireman's Fund paid out as a result of this accident but which have never been a part of this litigation. We agree with Pre Fab that it is too late for Fireman's Fund to suddenly bring those counterclaims when Pre Fab has done no discovery to ascertain the nature of the claims which were paid on. The discovery in this case is indeed closed, and a trial date in the near future has been set. Unlike the "new" theory amendment, which does not change the litigation but merely alters the focus, the attempt to bring in claims for losses which Fireman's Fund paid outside of this case represents a substantive new liability. Plaintiff's motion seeking to bar Fireman's Fund's amendment is granted to the extent that Fireman's Fund seeks to amend to add claims against Pre Fab for $531,925.07 worth of insurance proceeds paid out to entities not parties to this litigation.

### Conclusion

1. In Civil No. 90–2421 (MDL Docket No. 53), the complaint is DISMISSED IN ITS ENTIRETY as to defendant Fireman's Fund.

2. In Civil No. 89–1107 (MDL Docket No. 56), the Third–Party complaint by AIM against Fireman's Fund is DISMISSED on the direct action statute theory. The motion to dismiss is DENIED so far as it seeks to dismiss AIM's own claim that it is an insured under the open marine policy. That matter is left for trial.

3. In Civil No. 89–1652, Sea Barge's motion to amend its counterclaims is GRANTED (MDL Docket No. 94). Fireman's Fund's motion to amend its counterclaims is GRANTED **to the extent of allowing it to plead in a manner parallel to Sea Barge,** and is DENIED **to the extent that it seeks to bring in counterclaims against Pre Fab for losses to third party non-litigants whose losses Fireman's Fund has already compensated.** (MDL Docket No. 95).

IT IS SO ORDERED.