**PITTSTON COMPANY, et al., Plaintiffs,**

v.

**ALLIANZ INSURANCE COMPANY, et al., Defendants.**

**Civ. A. No. 90–3631.**

United States District Court, D. New Jersey.

May 26, 1992.

As Amended June 19, 1992.

Dennis Drasco, Steven Ritardi, Lum, Hoens, Conant, Danzis & Kleinberg, Roseland, N.J., and Timothy A. Vanderver, Jr., David J. Farber, Paul A.J. Wilson, Patton, Boggs & Blow, Washington, D.C., for plaintiff.

John Agnello, Carella, Byrne, Bain, Gilfillan, Cecchi & Steward, Roseland, N.J., and Daniel H. Williams, III, Kaye, Scholer, Fierman, Hays & Handler, New York City, for intervenor plaintiffs Ultramar America Ltd. and Ultramar Petroleum Inc.

Joseph L. Ruby, Wiley, Rein & Fielding, Washington, D.C., and Douglas E. Arpert, Evans, Hand, Allabough & Amoresano, West Paterson, N.J., for defendant Travelers Ins. Co.

Neal M. Glazer, D'Amato & Lynch, New York City, and Irwin Burzynski, Scarpone & Edelson, Newark, N.J., for defendant Underwriters at Lloyd's and London Market Insurers.

Alfred J. Kuffler, Kevin G. O'Donovan, Palmer, Biezup & Henderson, Philadelphia, Pa., and Michael B. McCauley, Palmer, Biezup & Henderson, Camden, N.J., for defendant Gibbs and Companies.

William B. McGuire, Tompkins, McGuire & Wachenfeld, Newark, N.J., for defendants Hartford Ins. Co., Hartford Fire Ins. Co., Allianz Ins. Co., Ancon Ins. Co., Rochdale Ins. Co., Chiyoda Fire & Marine Ins. Co., Unigard Mut. Ins. Co., Unione Italiana Reinsurance Co., and United Americas Ins. Co.

William Wachenfeld, Priestly, McGuire & Wachenfeld, Newark, N.J., for defendants Employers Ins. of Wausau and American Marine Underwriters, Inc.

## OPINION

WOLIN, District Judge.

Before the Court is a motion by plaintiff Pittston Company ("Pittston") and plaintiffs in intervention Ultramar America, Limited and Ultramar Petroleum, Inc. (collectively "Ultramar"), and cross-motions by various defendants, all which seek a declaration of which body of law governs the interpretation of a number of insurance contracts. The parties variously seek to have New Jersey, New York or federal maritime law applied to the contracts of insurance at issue in this action. For the reasons that follow, defendants' cross-motions will be denied, and plaintiffs' motion will be granted in part.

### BACKGROUND

This is an insurance coverage dispute in which the parties are battling to avoid ultimate responsibility for costs expended to remediate New Jersey land and water that has been fouled by petroleum leaks and spills over a number of years. The subject of the action is a petroleum terminal and storage facility located in Jersey City, New Jersey, commonly referred to as "Tankport."

The Tankport facility consists of two sites separated by a 6,000 foot pipe corridor. The smaller site is an area of approximately 2.5 acres that adjoins water and contains a barge dock from which petroleum products were pumped from barges through the pipelines to the other larger site. The other site covers an area of approximately 28 acres and contained numerous above-ground storage tanks, the majority of which were removed between 1990 and 1991. Petroleum stored in the tanks was either pumped into trucks for retail distribution, or pumped back to the docks and onto barges.

Tankport had been operated since the 1890s. It was purchased by Pittston in 1954, and was owned by Pittston or its affiliates or subsidiaries (hereafter referred to collectively as "Pittston")[1] until May 1983. Tankport was used by Pittston to receive and store barge shipments of Number 2, Number 4 and Number 6 fuel oil.

On April 30, 1983, Ultramar acquired Tankport from Pittston when it purchased all outstanding shares of stock in Pittston Petroleum, Inc. In the Stock Purchase Agreement, Pittston agreed, with limitations, to indemnify Ultramar for liabilities it incurred as a result of petroleum released on the Tankport site prior to the sale.

In November 1988, Ultramar filed a complaint in this District against Pittston and PPG Industries, Inc. that related to chromium contamination found on the Tankport site. Based on, among other things, the indemnification provision in the sales agreement, Ultramar sent Pittston a proposed amended complaint in August 1989 that added a claim based on petroleum contamination. Pittston and Ultramar settled the suit on April 9, 1990. Under the settlement agreement, Pittston agreed to pay for 80% of all cleanup costs incurred to remediate the petroleum contamination at Tankport, and Ultramar agreed to pay the remaining 20%.

Pittston sought insurance coverage from the defendant insurers for its share of the costs of cleaning up Tankport. No private resolution of the insurance claims was reached.

A complaint was filed by Pittston against the defendants insurers in New Jersey Superior Court for indemnification for payments made by Pittston to Ultramar. The case was removed to federal court pursuant to 28 U.S.C. § 1441(d),[2] because one of

---

1. Because each of the Pittston affiliates or subsidiaries which at times owned Tankport were named as insureds under all of the policies issued to Pittston that are in issue in this case, the Court need not discuss them separately.

2. That section provides in part that: "Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district and division embracing the place where

the defendant insurers, Insurance Company of Ireland, PLC, by virtue of its being 100% owned by the Government of Ireland, is an "agency or instrumentality of a foreign state" under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603(b)(2).[3] Ultramar then joined the action as intervenor plaintiffs.

This action involves two types of insurance policies: Comprehensive General Liability ("CGL") and Comprehensive Marine Liability Program ("CMLP"). Travelers Insurance Company ("Travelers") issued the CGL policies in issue to Pittston, but did not participate in the CMLP policies. All of the other defendants' potential liabilities derive from the CMLP policies.[4]

Pittston purchased a series of CGL insurance policies from Travelers that covered all of Pittston's United States and Canadian operations beginning in 1963 and ending on January 1, 1981.[5] Until the early 1970s, none of those policies contained a provision that excluded environmental contamination from its coverage. The policy limits ranged between $100,000 and $1 million until 1975, and remained at $1 million from 1975 until 1981. None of the CGL policies contained a choice-of-law provision.

Beginning in 1978, Pittston also purchased a series of CMLP policies that covered Pittston's marine operations, the last of which terminated on June 30, 1984. These policies provided traditional marine insurance coverage to Pittston, including hull, barge, cargo, charterer's and wharfinger's liability coverage. Pittston asserts that these policies also provided onshore, non-marine, pollution coverage, referred to by Pittston as "stand alone" pollution coverage. These policies had limits that ranged between $5 million and $25 million. The Hartford Insurance Company ("Hartford") was the sole underwriter of the CMLP policies between January 1, 1978 and June 30, 1980. Other defendants subscribed to varying degrees to subsequent CMLP policies. The last of the policies named Ultramar as an additional insured. Ultramar purchased one CMLP policy at the time of the sale of Pittston Petroleum, which provided coverage between April 1983 and April 1984. The policy named Pittston as an additional insured. None of the CMLP policies contained a choice-of-law provision.[6]

### DISCUSSION

Pittston and Ultramar have moved for a declaration that New Jersey law governs. The insurers oppose the motion on the ground that a declaration of applicable law is premature because discovery is still in an early stage in the litigation, and no specific conflict of law has yet been raised requiring that a choice be made. Alternatively, some insurers have cross-moved for a declaration that New York law governs the construction and interpretation of the policies. The Court will address the CGL and CMLP policies separately.

---

such action is pending. Upon removal the action shall be tried by the court without jury."

**3.** That section provides in relevant part that: "An 'agency or instrumentality of a foreign state' means any entity ... a majority of whose shares or other ownership interest is owned by a foreign state...."

**4.** Because a great number of insurance companies have been named as defendants based on the CMLP policies, the Court will address each by name only when necessary. Otherwise, they will be referred to as follows: collectively as "CMLP Insurers"; defendants that subscribed to CMLP policies issued to Pittston will be referred to as "Marine Insurers"; defendants that subscribed to CMLP policies issued to Ultramar will be referred to as "Ultramar Insurers".

**5.** Travelers has conceded its issuance of policies during these years. Pittston further contends

that Travelers issued CGL policies to it beginning in 1954. For purposes of this motion, the dispute is immaterial. If the disputed policies are found to have been issued and covered Tankport, this decision will apply to them. Otherwise, it will not.

**6.** Although the insurers argue that a "New York Suable Clause" contained in some of the policies indicates an intent that New York law would govern the interpretation of those policies, they do not contend that this provision constitutes a choice-of-law provision. The "New York Suable Clause" deems the place of issue and delivery of the policy to be New York, and provides that the underwriters of the policy may be sued in New York. The provision additionally states that "all matters arising hereunder shall be determined in accordance with American law and practice."

As an initial matter, the parties are in disagreement as to what type of motions are before the Court. Plaintiffs contend that a motion for declaration of applicable law is a form of *in limine* motion. Defendants, however, insist that, as plaintiffs are seeking a decision on a question of law, the motions must be adjudicated under the standard for summary judgment. As is evidenced by appellate review *de novo,* a choice of law decision involves resolution of a question of law. *See Allison v. ITE Imperial Corp.,* 928 F.2d 137, 138 (5th Cir.1991); *Quintero v. Klaveness Ship Lines,* 914 F.2d 717, 721 (5th Cir.1990); *Mitchell v. State Farm Fire & Cas. Co.,* 902 F.2d 790, 792 (10th Cir.1990). To the extent that application of the legal standard for determining choice of law is dependent on the facts of the case, in the absence of findings of fact, resolution of the choice of law issue can occur only if the material facts are undisputed. In this sense, a motion for declaration of applicable law is a motion for summary judgment. The Court will treat these motions as such.

A. *Choice-of-law Rules Under the FSIA*

 A threshold issue raised by the parties is whether, because federal jurisdiction in this action arises solely from the FSIA, federal or state choice-of-law rules should govern in this action. There is a split of authority on the issue in the circuit courts of appeal. Compare *Barkanic v. General Admin. of Civil Aviation of the Peoples Republic of China,* 923 F.2d 957, 959–60 (2d Cir.1991) (applying state choice-of-law rules) with *Schoenberg v. Exportadora de Sal, S.A. de C.V.,* 930 F.2d 777, 782 (9th Cir.1991) (applying federal common law choice-of-law rules).

As to most of the parties in this litigation, the Court does not believe that an issue exists. The FSIA is addressed to actions involving foreign states and their agencies and instrumentalities. It does not purport to alter the substantive rights of non-"foreign state" defendants. Thus, there can be no doubt that state choice-of-law rules govern all claims by plaintiffs against all defendants except the Insurance Company of Ireland.

As to the Insurance Company of Ireland, the Court agrees with the Second Circuit that state choice-of-law rules should be applied. The *Barkanic* court reasoned that application of state choice-of-law rules would best further the intentions of Congress in enacting the FSIA. That statute provides in part: "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Relying on this provision, the United States Supreme Court held in *First Nat'l City Bank v. Banco para el Comercio Exterior de Cuba,* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) that state law generally governs the rights and liabilities of the parties in FSIA actions. *Id.* at 622 n. 11, 103 S.Ct. at 2598 n. 11. Because the FSIA was enacted only to provide foreign states and their instrumentalities access to federal courts to ensure uniformity in the application of the doctrine of sovereign immunity, in those cases where the statute does not afford immunity, foreign states should be treated no differently than private defendants. This policy is best achieved by applying state choice-of-law rules to actions based on state law. *Barkanic,* 923 F.2d at 960.

 That is not to say, however, that federal choice-of-law rules should not be applied if they are applicable on a basis independent of the FSIA. The Marine Insurers contend that federal choice-of-law rules should be applied to some of the insurance policies because of their alleged "maritime" nature, which it is contended makes claims related to those policies subject to the admiralty jurisdiction of the federal courts. The Court agrees. To the extent any of the claims in this action would otherwise be governed by federal choice-of-law rules, application of such rules is not defeated or otherwise altered by the FSIA.

B. *Choice-of-law as to Travelers' CGL Policies*

 Plaintiffs and Travelers agree that New Jersey choice-of-law rules must be

applied to determine which state's substantive law controls the rights and liabilities of the parties under the CGL policies. The parties disagree, however, as to the outcome of an application of New Jersey choice-of-law rules to the facts of this case. Plaintiffs contend that New Jersey courts would apply New Jersey substantive law to the CGL policies. Travelers contends that New Jersey courts would not resolve the choice-of-law issue on the facts presented to the Court at this time. In the alternative, it contends that New Jersey courts would apply New York law.

The leading New Jersey case on choice-of-law in the context of contracts for insurance is *State Farm Mut. Ins. Co. v. Simmons*, 84 N.J. 28, 417 A.2d 488 (1980). *Simmons* involved the question whether Alabama or New Jersey law governed a particular issue of insurance coverage on an insurance policy issued by an Alabama insurer to an Alabama resident to cover an Alabama automobile that was involved in an accident in New Jersey which resulted in five deaths. The New Jersey Supreme Court stated in *Simmons* that

> [T]he proper approach in resolving conflict-of-law issues in liability insurance contract controversies is that which may be synthesized from th[e] ... evolution of the law in both the contract field as well as in the somewhat related tort field, particularly in the area of automobile accident litigation. This calls for recognition of the rule that the law of the place of the contract ordinarily governs the choice of law *because this rule will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk* during the term of the policy and will furnish needed certainty and consistency in the selection of the applicable law.

*Id.* at 37, 417 A.2d 488 (emphasis added). Applied to the facts of that case, the court found that Alabama law applied.

Although *Simmons* did not expressly adopt the "most significant relationship" test of the *Restatement (Second) of Conflicts of Law* (1971) (hereafter "*Restate-

ment*"), it approvingly discussed the *Restatement* principles at length, noted that prior New Jersey Supreme Court precedent was "not inconsistent" with the *Restatement* approach, and applied the factors set forth by the *Restatement. Id.* at 34–39, 417 A.2d 488. Subsequent New Jersey Appellate Division decisions have made clear that the *Restatement* "most significant relationship" test is the law of New Jersey. *Johnson Matthey Inc. v. Pennsylvania Mfrs. Assoc. Ins. Co.*, 250 N.J.Super. 51, 593 A.2d 367 (App.Div.1991); *Bell v. Merchants and Businessmen's Mut. Ins. Co.*, 241 N.J.Super. 557, 562, 575 A.2d 878 (App.Div.1990); *Molyneaux v. Molyneaux*, 230 N.J.Super. 169, 180, 553 A.2d 49 (App.Div.1989); *Colonial Penn Ins. Co. v. Gibson*, 230 N.J.Super. 55, 58, 552 A.2d 644 (App.Div.1989); *Bernick v. Jack Frost*, 210 N.J.Super. 397, 403, 510 A.2d 56 (App.Div.), *certif. denied*, 105 N.J. 511, 523 A.2d 158 (1986); *see also Veazey v. Doremus*, 103 N.J. 244, 247, 510 A.2d 1187 (1986) (characterizing *Simmons* as having adopted "the more flexible governmental-interest analysis in choice-of-law decisions").

Section 188 of the *Restatement* sets forth the general rule to be applied in contract actions. That section provides in part:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties ... the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and
>
> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Section 6 of the *Restatement*, incorporated into § 188(1), lists the following factors for consideration to determine the state with the most significant relationship:

(a) the needs of the interstate and international system,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Section 193 of the *Restatement*, approvingly quoted in full in *Simmons*, 84 N.J. at 35, 417 A.2d 488, provides instruction in the application of the factors set forth in § 188(2) to insurance contracts. That section states that the law of the state where it is understood the insured risk would be principally located presumptively governs the rights of the parties to such a contract:

The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

*Restatement* § 193. Section 193 is based on the rationale that, for a number of reasons,

the location of the risk is a matter of intense concern to the parties to the insurance contract. And it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the risk is to be principally located would be applied to determine many of the issues arising under the contract. Likewise, the state where the insured risk will be principally located during the term of the policy has a natural interest in the determination of issues arising under the insurance contract.

*Restatement* § 193, Comment c. Thus, according to the drafters of the *Restatement*, "[t]he risk's principal location is the most important contact to be considered in the choice of the applicable law, at least as to most issues", and "will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located." *Restatement* § 193, Comment b.

In *Simmons*, the New Jersey Supreme Court expressly recognized the "the reasonable expectations of the parties concerning the principal situs of the insured risk," as a factor of great weight in determining which state's law would be applied to an insurance contract. 84 N.J. at 37, 417 A.2d 488 (citing *Restatement* § 193). Comment b to § 193 explains that for automobile liability policies, the parties "will usually know beforehand where the automobile will be garaged at least during most of the period in question." Thus, the New Jersey Supreme Court considered it significant that, among other factors, the insured's automobile in *Simmons* was "purchased and registered in Alabama and had remained so registered", 84 N.J. at 38, 417 A.2d 488, and that the insured had only been in New Jersey temporarily and had "planned to return to Alabama", *id.* at 38–39, 417 A.2d 488. Accordingly, New Jersey determined that Alabama had the "most significant relationship" to the automobile insurance contract. *Id.* at 39, 417 A.2d 488.

Although *Simmons* did not expressly adopt § 193 as a rule of New Jersey law, its full quotation by the Supreme Court, together with that court's emphasis on the importance of the location of the insured risk as a factor in the determination of the state with the most significant relationship to an insurance contract, indicates approval of the principle set forth in that section.

Consequently, later Appellate Division decisions have embraced § 193 as a rule of New Jersey law. *Johnson Matthey*, 250 N.J.Super. at 60, 63, 593 A.2d 367; *Bell*, 241 N.J.Super. at 563, 575 A.2d 878.

Travelers argues that the Appellate Division has misconstrued *Simmons* in applying § 193 to insurance contracts. In particular, Travelers relies on the following passage from *Simmons:*

> We thus hold that, in an action involving the interpretation of an automobile liability insurance contract, the law of the place of the contract will govern the determination of the rights and liabilities of the parties under the insurance policy.

84 N.J. at 37, 417 A.2d 488. Travelers asserts that this passage establishes the "place of contract" as an overriding factor in determining choice-of-law questions for insurance contracts. Although read in isolation this passage could be seen as in conflict with § 193, the Court finds that this passage, read in context with other portions of *Simmons* and the facts of that case, presents no bar to the application of § 193.

The "holding" of *Simmons* relied on by Travelers is expressly confined to policies of *automobile* insurance. It was also specifically predicated on earlier language in the opinion that the "place of contract" would be accorded significance *"because* this rule will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk during the term of the policy." *Id.* (emphasis added). For policies of automobile liability insurance, "the policy will usually be solicited in the state of the insured's domicil and usually the insured risk will also be located there". *Restatement* § 193, Comment b. Thus, the location of the risk, the place of contract, and the parties' reasonable expectations will generally coincide with respect to such policies. For policies that cover risks located in multiple states, however, the "place of contract" rule does not comport with the parties' expectations of the location of the insured risks. *Johnson Matthey*, 250 N.J.Super. at 61, 593 A.2d 367.

In *Simmons*, the New Jersey Supreme Court warned that the "place of contract" rule was not the end-all and be-all of choice-of-law determinations for insurance contracts. It cautioned that the rule

> [s]hould not be given controlling or dispositive effect. It should not be applied without a full comparison of the significant relationship of each state with the parties and the transaction. That assessment should encompass an evaluation of important state contacts as well as a consideration of the state policies affected by, and governmental interest in, the outcome of the controversy.

84 N.J. at 37, 417 A.2d 488. In *Simmons*, every contact except the location of the injury pointed to the application of Alabama law. Because *Simmons* involved a choice-of-law problem as to a contract, not a tort, the one contact that pointed toward New Jersey was of little relevance. Hence, there was no need for the court to actually weigh the factors listed in § 188(2) to determine the state with the most significant relationship to the contract, and, accordingly, no need to directly consider § 193.

In this case, however, with factors such as the place of negotiation and contract pointing toward states other than New Jersey, an actual assessment of the relative weights of the § 188(2) factors is necessary. Therefore, § 193, which was intended to provide guidance in applying § 188(2) to the special case of insurance contracts, needs to be considered.

The presumption of § 193 "enjoys greatest significance when an immovable object is involved". Unlike the automobile in *Simmons*, the object at issue in this case that is insured against risk—the Tankport site and improvements—is immovable. Hence, this case presents a much stronger case for the application of § 193 than did *Simmons*.

As the drafters of the *Restatement* accurately predicted with respect to New Jersey in Comment f to § 193, "courts would be inclined to treat [a multi-risk, multi-state policy], at least with respect to most issues, as if it involved [multiple] policies, each

insuring an individual risk." The Appellate Division held in *Johnson Matthey* that

> a casualty insurance policy, wherever written, which is purchased to cover a New Jersey risk, alone or with other risks in other states, is subject to interpretation of its coverage and exclusion language according to New Jersey local law. Although this rule is particularly suitable to environmental litigation, in which large numbers of casualty insurance policies are involved, it is not limited to that setting.

250 N.J.Super. at 61, 593 A.2d 367. As is evident from the quotation immediately above, New Jersey's interest in the availability of funds to cleanup Tankport need not even be considered to determine the applicability of § 193, because that rule is applied to all casualty insurance policies, not just those in which an environmental cleanup is involved.

Travelers argues that this Court should disregard the express holding of *Johnson Matthey*. The Third Circuit Court of Appeals, however, has counseled District Courts that the decisions of state intermediate appellate courts "should be accorded proper regard and are presumptive evidence of state law." *Commercial Union Ins. Co. v. Bituminous Cas. Corp.*, 851 F.2d 98, 100 (3d Cir.1988). *Johnson Matthey* is directly on point. *Simmons* by its express terms is limited to contracts of automobile liability insurance. Travelers has not sufficiently convinced this Court that the New Jersey Appellate Division has inaccurately predicted the New Jersey Supreme Court's ultimate resolution of choice-of-law problems as to a general comprehensive liability insurance contract covering risks in multiple states, should that issue ever come before that court.[7]

Travelers advances yet an additional argument to apply New York law to the CGL policies. It contends that because Pittston's obligation to indemnify Ultramar arises from an agreement that is by its terms governed by New York law, "[i]t would make no sense to apply New Jersey law to determine Travelers' obligation to Pittston for an obligation which is itself governed by New York law." (Travelers Brief at 26). The Court disagrees. The indemnification provision contained in the Stock Purchase Agreement between Pittston and Ultramar obligates Pittston to pay Ultramar for costs incurred in the cleanup of petroleum pollution only "to the extent that [it] is recompensable by insurance." (Stock Purchase Agreement as amended October 25, 1983, Stipulations Exhibit A). The Court cannot see how it would be inconsistent, illogical, or even difficult, to apply New Jersey law to the agreement between Pittston and Travelers to determine the "extent" of insurance coverage, but apply New York law to determine whether Pittston has fulfilled its obligation to indemnify Ultramar to that "extent" of insurance coverage.[8] That Pittston's claim against Travelers arises from an indemnification agreement Pittston made with Ultramar is irrelevant to the choice of law analysis.

Travelers argues that this motion is not ripe because no specific conflict of law has been raised. To support this argument, it

---

7. The Third Circuit has not ruled to the contrary. *Armotek Indus., Inc. v. Employers Ins. of Wausau*, 952 F.2d 756 (3d Cir.1991), cited by Travelers, is inapposite. There, the Third Circuit declined to consider application of the law of the state where the risk was located—Connecticut—because none of the parties contended that that state's law should be applied. *Id.* at 759 & n. 4. Thus, § 188(2)(d) and § 193 had little or no impact on the court's analysis. The Court also does not find that *First State Underwriters Agency v. Travelers Ins. Co.*, 803 F.2d 1308, 1316 (3d Cir.1986) provides any controlling authority contrary to the Court's decision. The statement in *State Farm* that New Jersey follows a "general rule" favoring the place of contract is not inconsistent with the Court's analysis in this case.

8. The Ultramar Insurers make a similar argument with respect to a CMLP policy, resting additionally on the fact that the indemnification clause was expressly incorporated into the policy. For the same reasons Travelers' argument is rejected, so too is the Ultramar Insurers' argument. Again, the extent of coverage under independent policies need not be governed by New York law to determine whether Pittston has lived up to its obligations under the indemnification provision, as construed under New York law.

cites to *Simmons,* 84 N.J. at 41, n. 1, 417 A.2d 488. In that footnote, the New Jersey Supreme Court stated that

> If in fact the same result with respect to coverage would be obtained in this case by application of either New Jersey law or Alabama law, there would be no actual conflict of law between the two states, obviating the necessity to choose between them.

*Id.* This quote does not support the proposition that a true conflict is a prerequisite to a choice of law determination. It states not that in the absence of a conflict no choice *can* be made, but only that when no conflict exists, no choice *need* be made. This is apparent from the *Simmons* decision itself. Although the Supreme Court found that Alabama would not provide coverage for the accident, it clearly avoided deciding whether New Jersey would provide coverage, *id.* at 40–41, 417 A.2d 488, and yet nevertheless decided that Alabama law governed the interpretation of the policy because it determined that Alabama had the most significant relationship to the contractual transaction. *Id.* at 42–43, 417 A.2d 488. Thus, it decided the choice of law issue without first finding the existence of a "true conflict" between Alabama and New Jersey law.

Travelers further contends that, were the Court to make some choice of law ruling, it should do no more than decide which state's law presumptively applies to the CGL policies, because no specific conflict of law has been raised by Pittston with respect to those policies. The Court disagrees.

Under *Johnson Matthey,* when a casualty insurance policy covers a "New Jersey risk", that policy is "subject to interpretation of its coverage and exclusion language according to New Jersey local law." 250

N.J.Super. at 61, 593 A.2d 367. The one prerequisite to determining the choice of law issue is satisfied in this case; the CGL policies cover New Jersey risks. Thus, the Court will declare that issues of interpretation of coverage and exclusion will be determined under New Jersey law. *Johnson Matthey* correctly recognized, however, that other issues which may arise, including issues related to misrepresentations, and other issues that may impact on the validity or formation of the policies, cannot be resolved in the absence of a conflict. *Id.* at 64–66, 593 A.2d 367. Pittston has not yet identified any specific conflict between New York and New Jersey law on these issues. As to these other issues, there is no need to do more than declare that, under § 193, New Jersey law will govern in the absence of a conflict. Therefore, until Travelers or plaintiffs identify and place a true conflict of law before the Court on these issues, the parties are to proceed under the assumption that New Jersey law governs them.

The Court believes that this preliminary declaration is necessary so that the parties have some framework on which to develop their respective cases. A sufficiently concrete issue has been raised as to whether, in the absence of a conflict, New Jersey or New York rules of insurance contract interpretation will govern the parties' rights and obligations under the policies. Accordingly, the Court concludes that, under *Johnson Matthey* and *Restatement* § 193, New Jersey law governs issues of interpretation of coverage and exclusion provisions, and presumptively governs the rights and liabilities of the parties under the Travelers CGL policies.[9] The net result of this limited declaration, as to issues other than those of interpretation of coverage and exclusion language, is to allocate, in the event

---

**9.** Further reason to presumptively apply the law of New Jersey may be found by looking to New York law. Under a "grouping of contacts" theory, New York courts have applied the rule embodied in *Restatement* § 193 to insurance contracts. *See Steinbach v. Aetna Cas. and Surety Co.,* 81 A.D.2d 382, 385, 440 N.Y.S.2d 637, 640 (1st Dep't 1981) ("grouping of contacts" rule established by Court of Appeals "requires courts to apply the law of the State which the parties

understood would be the principal location of the insured risk and the one most intimately concerned with the outcome of the litigation" (citing § 193)); *Colonial Penn Ins. Co. v. Minkoff,* 40 A.D.2d 819, 338 N.Y.S.2d 444, 445 (1st Dep't 1972), *aff'd,* 33 N.Y.2d 542, 347 N.Y.S.2d 437 (1973). It would be somewhat anomalous for this Court to apply New York law to a dispute to which a New York court would probably have applied New Jersey law.

conflicts of law arise, the burden to establish the state with the most significant relationship to a particular issue: The party contending for application of the law of a state other than New Jersey on any issue bears the burden to demonstrate that that state has a more significant relationship to the issue than does New Jersey.

### C. *Choice-of-law as to the CMLP Policies*

The choice-of-law problems arising from the CMLP policies and the parties' contentions as to the meaning of those policies are complex. The difficulty arises from the parties' differing constructions of the policies. Except for the CMLP policy issued to Ultramar, No. D FSJ 100–4/83, the CMLP policies are structured the same. The CMLP policies issued to Pittston are described as "Marine Package Program" policies. Except for separate endorsements and schedules, the policies consist of two "Sections": "Part I—General Policy Terms and Conditions and Insuring Agreements"; and "Part II—Specific Policy Terms and Conditions and Insuring Agreements relative to" enumerated marine coverages. The number of included specific marine coverages differs slightly between the six policies, but consist of combinations of coverage for "Charterer's Liability", "Wharfinger's Liability", "Cargo Liability", "Coverage on Owned Barges", "Bailee and Warehousemens Legal Liability", and "Open Cargo" or "Open Cargo (All Risks Liability)".

Part I of the policies, captioned "General Policy Terms and Conditions", provides

Unless otherwise specified, the following Terms and Conditions are deemed incorporated under all sections of this Policy:

\* \* \* \* \* \*

II. This policy is to cover any loss, damage, liability and/or expense that the assured shall be liable to pay and/or shall pay or sue and labor, arising out of, or in consequence of, the actual and/or potential discharge, emission, spillage or leakage upon or into the seas, waters, land, or air, of oil, petroleum products, chemicals or other substances of any kind or nature whatsoever.

(hereinafter referred to as "the Pollution Clause"). Part II contains detailed descriptions of the enumerated marine coverages listed above.

The CMLP policy issued to Ultramar differs in one significant respect. It contains a nearly identical Pollution Clause contained in the CMLP policies issued to Pittston, but instead of being placed under Part I as a "General Condition", it is included under its own section as a "Specific Condition" under Part II.

Pittston contends that the Pollution Clauses in the policies issued to it provide "stand-alone" coverages that insure against any kind of pollution that occurred at any of its facilities. The Marine Insurers, conversely, contend that the Pollution Clause is not a separate "stand-alone" coverage provision, but is merely a general term that confers no coverage by itself, but was only included to make clear that the specific marine coverages in Part II of the policies insure against losses due to pollution. The Ultramar Insurers contend that the placement of the Pollution Clause under Part II of the policy was done as an accommodation to Ultramar, and was not intended to change it into "stand-alone" coverage.

Pittston's claims against the CMLP Insurers will turn in large part on the meaning of the Pollution Clause. From the investigations undertaken thus far of the Tankport site, it appears that a substantial part of the petroleum pollution on the site did not result from marine activities, and would not be covered by the marine insurance provisions contained in Part II of the policies. Thus, unless the Pollution Clause is interpreted as is suggested by Pittston, the CMLP Insurers' liability will probably be substantially less than is claimed by Pittston.

The choice-of-law problem presented by these policies is two-tiered. First, there is the issue whether federal or state choice-of-law rules should be applied. Second, assuming the appropriate body of choice-of-law rules can be ascertained, is the issue of which body of law will governs claims under the policies.

1. Should Federal or State Choice-of-law Rules Be Applied to the CMLP Policies?

■ Federal choice-of-law rules apply to claims subject to the admiralty jurisdiction of the federal courts. *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld*, 921 F.2d 409, 414 (2d Cir.1990); *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 890 (5th Cir.1991); *Navegacion Goya, S.A. v. Mutual Boiler Machinery Ins. Co.*, 1972 A.M.C. 650, n. 1. Thus, to determine whether federal choice-of-law rules apply to the CMLP policies requires a determination whether and to what extent the policies are subject to the admiralty jurisdiction of this Court. If admiralty jurisdiction does not exist over the contract dispute, then *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) requires application of New Jersey choice-of-law rules.

Contract claims are subject to the admiralty jurisdiction of the federal courts if the contract is "wholly maritime" in nature. *Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 880 (3d Cir. 1992). When a contract is only partially "maritime" in nature, federal courts have three options. First, if the non-maritime aspects of a contract are "merely incidental" to the contract, federal courts may exercise maritime jurisdiction over the entire contract. *Id.* Second, if the non-maritime aspects of the contract are not merely incidental, courts can exercise jurisdiction over just the maritime portion of the contract claims if those portions can be severed from the non-maritime portions with-out prejudice to either party. *Id.* Third, if the non-maritime aspects of the contract are not incidental and cannot be severed from the maritime aspects, federal courts must decline to exercise jurisdiction over any part of the contract. *Id.* at 881.

Under the CMLP Insurers' interpretation, the CMLP policies provide only marine coverage, and are thus governed entirely by maritime law.[10] Under Pittston's interpretation, the CMLP policies are part maritime and part non-maritime. The non-marine coverage claimed by Pittston to be contained in the Pollution Clause would not be "merely incidental" to the policies. Accordingly, such coverage would not be subject to the admiralty jurisdiction or the application of maritime law.[11] Because, however, that coverage, if it existed, could be severed without prejudice to either party, maritime law, including federal choice-of-law rules, would apply as to the marine coverages, and state law would apply to the non-marine coverage.

Thus, the jurisdictional, and consequently, the choice-of-law, determination is inextricably intertwined with the interpretation of the policies. Depending on which parties' interpretation of the policies prevails, either federal or state choice-of-law rules could apply. Of course, the purpose of the choice-of-law analysis is to determine which body of law will be used in the first instance to interpret the policies. This presents a conundrum: The policies have to be interpreted to determine which body of choice-of-law rules apply, yet the policies cannot be interpreted without first choos-

---

**10.** By "maritime" law, the Court refers to the body of law that governs the policies as a matter of federal law. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955) dictates that in the absence of a controlling federal statute or an established rule of general maritime law, state law governs the scope and validity of contracts of marine insurance. Because it does not appear that any federal statute or established rule of maritime law governs the interpretation and construction of contracts for marine insurance, state law controls these issues. *Healy Tibbitts Const. Co. v. Foremost Ins. Co.*, 482 F.Supp. 830, 835 (N.D.Cal. 1979).

**11.** Some of the marine insurers assert the somewhat curious argument that if the Pollution Clause is found to provide stand-alone non-marine coverage, then federal maritime law as to misrepresentations (the doctrine of *uberrimae fidei* ) should be applied to void the policy. If in fact the Pollution Clause provides non-marine coverage, the Court questions how it can apply federal maritime law to an insurance provision over which admiralty jurisdiction does not extend. Further, the Court notes that the application of *uberrimae fidei* even as to a contract for traditional marine insurance has been called into question. *See Albany Ins. Co.*, 927 F.2d at 888–90. In any event, the Court need not and does not at this time resolve the issue.

ing some body of law as a frame of reference to provide principles of interpretation.

As is often the case with choice-of-law questions, this gordian knot need not be cut, but can instead be tossed to the side, because, with respect to contract issues to which an admiralty court would apply state law, New Jersey and federal choice-of-law rules are the same. New Jersey applies the "most significant relationship" test of *Restatement* § 188 to determine which state's law will govern the interpretation and scope of insurance contracts. *See* discussion *supra*. Federal courts sitting in admiralty apply the same test. *Albany Ins. Co.*, 927 F.2d at 891; *State Trading*, 921 F.2d at 417; *Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d 461, 464 (5th Cir.1984); *In re Litigation Involving Alleged Loss of Cargo*, 772 F.Supp. 707, 711 (D.P.R.1991); *Healy Tibbitts*, 482 F.Supp. at 835; *Navegacion Goya, S.A.*, 1972 A.M.C. at 653 n. 2. The Court could find no case in which a court sitting in admiralty applied the rule of § 193 as part of the *Restatement* test. This can be explained, no doubt, due to the nature of most maritime risks as unfixed in location. *See e.g., Navegacion Goya*, 1972 A.M.C. at 655 (location of subject matter factor of no weight "[p]articularly where the subject matter of the contract of insurance was a ship which would be travelling the oceans of the world"). In those cases, § 193 has no application. There appears little reason, however, to selectively adopt only part of the *Restatement* test without also adopting § 193. Therefore, this Court holds that the *Restatement* test of § 188, including § 193 when applicable, provides the federal choice of law rule for application to contracts of marine insurance.

■ The marine insurers contend that *Valdesa Compania Naviera v. Frota Nacional de Petroleiros*, 348 F.2d 33 (3d Cir. 1965) requires application of the "place of contract" rule to maritime contracts. *Valdesa* admittedly holds as much. Decided as it was, however, before the *Restatement (Second) of Conflict of Laws* (1971) was published, and considering the evolution that has occurred in the area of con-

flicts of law, *Valdesa* can no longer be considered good precedent. For this rule, *Valdesa* relied on *Liverpool & Great Western Steam Co. v. Phenix Ins. Co.*, 129 U.S. 397, 9 S.Ct. 469, 32 L.Ed. 788 (1889), a case of dubious authority in light of subsequent Supreme Court decisions indicating a movement away from mechanical choice of law tests in admiralty actions and toward more flexible evaluations. In *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), the Supreme Court held that the seven factors established in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) for choice of law in maritime tort suits, which created a *Restatement*-like test, "were intended to guide courts in the application of maritime law generally." *Romero*, 358 U.S. at 382, 79 S.Ct. at 485; *see State Trading*, 921 F.2d at 416. Conflicts analysis has evolved too far in the past 27 years for the Court to blindly adhere to a statement in an alternative holding in *Valdesa* that the place of contract rule governs the choice of law to be applied to a maritime contract.

2. Which State's Law Governs the Interpretation of the Pollution Clause Under the Most Significant Relationship Test?

■ Under the *Restatement* § 188 test for determining which state's law will govern the parties' rights under the CMLP policies, the Court must determine which state has the most significant relationship to the contracts. *Restatement* § 193 dictates, as is discussed *supra*, that with respect to policies of casualty insurance, when the state where the parties understand an insured risk is to be principally located during the term of a policy can be determined, that state's laws will presumptively govern the rights and duties of the parties. Otherwise, the factors in *Restatement* § 188(2) must all be weighed according to their importance to the transaction to determine which state has the most significant relationship to the contract.

Under Pittston's construction of the CMLP policies, those policies cover New Jersey risks, and accordingly, New Jersey

law would presumptively be applied to them. The CMLP Insurers claim that the policies do not cover New Jersey risks, and that, because most of the negotiations, executions and deliveries of the policies occurred outside of New Jersey, New Jersey law would not govern the interpretation of the policies.

The parties do not dispute that Part II of the CMLP policies cover, for the most part, traditional marine risks. Under *Wilburn Boat,* discussed *supra* at note 10, state law governs the rights of the parties with respect to these coverages. Certain of these marine coverages pertain to risks that are fixed in location. The "Wharfinger's Liability" provision in the policies covers certain liabilities incurred by Pittston in connection with its activities as "Wharfinger's [sic] and/or Terminal Operators and/or Landing Owners and/or Landing Operators and/or Stevedores." (Stipulations, Exhibit L). The locations of the subject matters of this provision are fixed. Therefore, under *Restatement* § 193, the law of the state in which any wharf, landing, terminal or stevedoring operation is located would presumptively govern the rights of the parties under the wharfinger's liability section of the policies. The "Bailee Warehousemen's Legal Liability" provision in the policies covers certain liabilities incurred by Pittston in connection with its activities as "bailee and/or as warehousemen and/or as stevedores." [12] (Stipulations, Exhibit L). The locations of the subject matters of this provision are also fixed. Therefore, under *Restatement* § 193, the law of the state in which any warehouse or stevedoring operation is located would presumptively govern the rights of the parties under the bailee warehousemen's legal liability section of the policies. With respect to any operations covered by the wharfinger's or warehousemen's liability provisions located at Tankport, New Jersey law would presumptively apply. The other marine coverages in Part II appear to cover risks that would not fall within the rule of § 193, and hence appear not subject to its presumption.

It is clear from the terms of the CMLP policies that the parties contemplated coverage for some risks that were principally located in New Jersey. To the extent the Pollution Clause provides stand-alone coverage, it too would be governed by New Jersey law. The CMLP policies do not unambiguously provide stand-alone coverage. But without resort, at a minimum, to extrinsic evidence of practice and custom in the marine insurance trade, the language of the policies alone does not preclude a finding of stand-alone coverage.[13] In addition, depending on whether New Jersey contract law was applied, extrinsic evidence might be needed to determine the parties' intentions and expectations, even in the absence of an ambiguity. *See Werner Indus., Inc. v. First State Ins. Co.,* 112 N.J. 30, 39, 548 A.2d 188 (1988).

The marine insurers do not contend that the Tankport pollution risks in issue were principally located outside New Jersey. Thus, there is no dispute as to the principal location of those risks. Rather, the insurers argue only that those risks are not covered by the policies. Their arguments, like Pittston's, rely extensively on rules of contract interpretation and extrinsic evidence of the parties' intentions. These arguments, to which the parties devoted extensive portions of their briefs, are prema-

12. Depending on the nature of the warehousing covered and the duration of the bailments, this coverage in the CMLP policies may not even constitute "marine" insurance subject to admiralty jurisdiction or law. *See Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 775 F.Supp. 101, 107–08 (S.D.N.Y.1991).

13. For example, with respect to the CMLP policies issued to Pittston, evidence of trade usage of "General Terms" versus "Specific Terms" may shed light on the insurers' argument that Part I of the policies provide no insurance coverage independent of the specific coverages specified in Part II of the policies. As another example, under Pittston's interpretation of the CMLP policies issued to it, the stand-alone coverage it argues for would be the only coverage in the policies to which no deductible applied. See *e.g.,* Policy No. D409–1/78, Part I, ¶ V, Stipulations, Exhibit L. Evidence of trade practices may confirm that this somewhat odd result is indicative that no stand-alone coverage was intended or provided. The policy issued to Ultramar presents different problems for the Ultramar Insurers.

ture. The Court will not at this time, at this early stage in this case, decide the substantive issue of whether the policies provide stand-alone pollution coverage. The Court finds, however, that it cán decide some aspects of the choice-of-law issue.

According to Comment a to *Restatement* § 193, the law of the state where risks are located determines "what risks are covered by the policy." Because there is an issue as to "what risks are covered by" the policies, and the risks for which it is contended coverage exists are indisputably located in New Jersey, the Court concludes under § 193 that New Jersey law will govern issues of interpretation of coverage and exclusion provisions, and presumptively govern other issues raised in connection with the CMLP policies. The Court disagrees with the marine insurers' contention that disputed fact issues preclude this determination. Only one fact is material to whether, under § 193, New Jersey law governs the interpretation of coverage provisions in the policies: the location of the risk. That fact is not in dispute. Tankport is located in New Jersey.

The Court agrees with the CMLP Insurers that any further declaration would be premature. Therefore, until the marine insurers or plaintiffs identify and place a true conflict of law before the Court as to any issue other than interpretation of the coverage provisions of the policies, the parties are to proceed under the rebuttable presumption that New Jersey law governs those other issues.

The Court recognizes that this conclusion is not without its flaws, and acknowledges that § 193 refers to the location of the *"insured* risk", and not merely the risk for which a party contends insurance is provided.[14] Nevertheless, the Court finds that no other resolution of the issue provides a more compelling analytical framework for resolving the merits of this case.

The alternative to the presumptive application of New Jersey law is to give § 193 no effect in the absence of clear evidence of stand-alone coverage. This would result in a weighing of all of the contacts between the parties during the negotiation, execution and performance of the policies, and could result in a choice of New York law. New York, however, has no presumptively greater interest than New Jersey does in determining whether the contested coverage is part of the policies, because the coverage, if it exists, protects New Jersey risks. Aside from New Jersey's interest in the availability of funds to pay to cleanup Tankport, an interest which the Court prefers not to weigh at this point, New Jersey's interest extends to the protection of the reasonable expectations of the insured. Plaintiffs clearly purchased coverage for some risks—the wharfinger and bailee warehousemen coverage—located in New Jersey. Their claim that they purchased additional insurance coverage for property located in New Jersey—the stand-alone pollution coverage—is not frivolous. This claim, however, is too closely entwined with the choice-of-law issue to be completely separated from it, because the propriety of application of New Jersey law is dependent on the existence of stand-alone pollution coverage. Given this stalemate, the Court believes it must resolve the issue in favor of application of the law of the state that would have the greatest interest in the issue, and whose law would accordingly govern, in the event coverage is found. Unless the insured's claim was clearly without merit, there seems no compelling reason to do otherwise.

Consistent with the *Restatement,* the Court's conclusion that § 193 dictates interpretation of coverage provisions, and presumptively dictates application of New Jersey law to other issues, does not preclude the application of another state's law to issues other than interpretation of coverage, such as issues related to formation and validity, in the event that a concrete conflict of law arises, and a party convinces the Court that another state has a more significant relationship to a particular issue. See *Restatement* § 193, Comment d. This finding also does not preclude any party from raising a concrete conflict between New Jersey law and an established

---

**14.** The full text of § 193 is set out at length *supra.*

policy of maritime law, which may lead to the application of maritime law. As with the Court's determination with respect to the CGL policies, the Court decides only which state's law controls the interpretation of coverage provisions, and otherwise applies in the absence of a conflict. No true conflict has yet been presented to the Court. Again, the Court reiterates that, with the exception of interpretation of coverage and exclusion language, the net result of its declaration is to allocate, in the event conflicts of law arise, the burden to establish the state with the most significant relationship to a particular issue: The party contending for application of the law of a state other than New Jersey on any issue bears the burden to demonstrate that that state has a more significant relationship to the issue than does New Jersey.

## CONCLUSION

For the reasons stated above, defendants' cross-motions for declarations of law will be denied. Plaintiffs' motion for a declaration of law will be granted only to the extent that the Court will declare that New Jersey law controls the interpretation of coverage and exclusion language in the policies, and that New Jersey law will presumptively govern all other issues, subject to rebuttal by proof that another jurisdiction has a more significant relationship to a particular issue that is found to conflict with New Jersey law.